Dear Sirs,

In accordance to my right to file habeas corpus I would like to plea for reconsidering my necessity to stay in custody. During the 1st court appearance I forgot to mention to the judge that I do not have a valid passport. My passport expired in 2009. I did not file for an extension to my passport so I would not be deemed as a person who wants to leave the country. I was awaiting for a phone call from the state dept. or prosecutors office as requested by the letter I sent to the state dept. by my lawyer Ms. Ramirez in 2007.

Instead, on the 31st of November 2017 4 car arrived by my doorstep with 5 policemen that was a sensation on my street. The prosecutions office instead of looking into their paperwork and reading my letter decided to send the police to find me. The neighborhood came to a conclusion I must be a pedophile (a version of being a gangster was too farfetched since I cannot walk fast or far)

My health:

In 2015 after my stroke, I was taken by ambulance to the Bradenton Hospital, where in an emergency heart operation was conducted. (according to my Doctor, it was the absolute last minute for me) 5 bypasses were done and unfortunately after turning off the artificial heart machine it turned out my heart will not work by itself. A few weeks later a decision was made that since my heart will not regain its strength I will need an experimental pacemaker or a heart transplant. I chose the first option.

The operation was done in Tampa Hospital, for the following year up till now I am under their supervision since this experimental pacemaker works on a continuous basis and requires a quarterly inspection to modify its settings. The last time I had it done was September 2017. I cannot travel since this technology is available only in the US and Japan.

And lastly my hearing. After experiencing multiple colds and infections of my lungs my right hearing nerves have died out. I have undergone an implant cochlear procedure. At the same time I was warned that more infections will destroy my left hearing nerves and I will become completely deaf. While in custody now I have undergone one cold spell and lost my hearing completely for 10 days. I have regained some but to a lesser level than before. I communicate with the medical staff by means of writing. My hearing implant has lost its settings and needs to be recalibrated, it has to be done my Doctor Marlow from Sarasota. One or more of these colds and I will become a completely deaf handicap. If that happens I will request my family file for damages.

Considering me a flight risk is completely impossible as I cannot walk more than 200 yards is completely absurd, if I had considered a life of a wanted person I would have traveled to a country in Latin America with which Poland has no extradition agreements. I am an innocent person who is fighting for his right at the European court of Human rights and according to many lawyers have a strong chance of winning this case. If released I will show up on any request by the prosecutor's office or State dept.

A Separate issue all together is the legality of the sentencing by the Supreme Court and appellate. The prosecution seems to be glorying these verdicts. One must mention that a supreme court is not the same as in the United States. In Poland the chairman and his deputy are chosen for a term.

Their financial salaries pensions and bonuses are under the discretion of the ministry of Justice. So as one can see the Supreme Court cannot be completely independent.

Both the convictions are delivered under the bill of 2005, a bill which not only prolongs the statute of limitation but also enforces the law to work retro actively. Under Polish law one is trialed under the bill that is current the first day of his/her trail. In my case that is the bill from 1997. The statute of limitation expired in 2005 and 2006 during my appellate trial in 2009. That is why these rulings should be considered void.

Yours Sincerely

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN THE MATTER OF THE
EXTRADITION OF

CASE No. 8:17-MJ-1811-TGW

DARIUSZ TYTUS PRZYWIECZERSKI

_____

CERTIFICATE OF EXTRADITABILITY
__AND ORDER OF COMMITMENT__

Pursuant to the provisions of the Extradition Treaty between the United States of America and the Republic of Poland, and upon the complaint of the United States Attorney for the Middle District of Florida, a warrant was issued for the apprehension of **DARIUSZ TYTUS PRZYWIECZERSKI**, a fugitive from Polish justice.

After the conclusion of an extradition hearing held on February 9, 2018, and the review of the Polish formal documents in support of extradition, which were admitted into evidence at the extradition hearing pursuant to Title 18, United States Code, Section 3190, I certify that the evidence before this court is sufficient to sustain extradition under the provisions of the applicable Treaty.

1. The relevant and applicable treaty provisions in full force and effect between the United States and the Republic of Poland are found

in the Extradition Treaty between the United States of America and the Republic of Poland signed on July 10, 1996 (Gvt. Ex. 2).

2. On or about March 29, 2005, following a trial in the District Court in Warsaw, Poland, **DARIUSZ TYTUS PRZYWIECZERSKI** was convicted of misappropriation of property assigned to him and others, in violation of Article 284, Section 2, and Article 294, Section 1 of the Polish Penal Code; and taking and misappropriating a third party's property, in violation of Article 278, Section 1 of the Polish Penal Code (Gvt. Ex. 1). Those charges alleged the misappropriation of $503,000.00 and $1,074,120.00, respectively, by **DARIUSZ TYTUS PRZYWIECZERSKI** and others. The convictions of **DARIUSZ TYTUS PRZYWIECZERSKI** were upheld on appeal (Gvt. Ex. 4). **DARIUSZ TYTUS PRZYWIECZERSKI** was sentenced to a cumulative sentence of three years and six months of imprisonment, and a fine.

3. The foregoing crimes for which **DARIUSZ TYTUS PRZYWIECZERSKI** has been convicted were committed in Poland, and are covered by the Treaty. Specifically, the misappropriation of funds in violation of the Polish Penal Code most closely corresponds with federal crimes of embezzlement and theft, in violation of 18 U.S.C. 641, or other related crimes in Chapter 31 of Title 18. See Collins v. Loisel, 259 U.S. 309, 312 (1922) ("the law does not require that the name by which the

-2-

crime is described in the two countries shall be the same"; rather, "it is enough if the particular act charged is criminal in both jurisdictions").

    4. The **DARIUSZ TYTUS PRZYWIECZERSKI** sought by Polish authorities, and the **DARIUSZ TYTUS PRZYWIECZERSKI** arrested in this district for extradition and brought before this court, are in each case the same individual (see Gvt. Ex. 3).

    5.   The evidence before this court is sufficient to justify **DARIUSZ TYTUS PRZYWIECZERSKI**'s committal to the appropriate authorities of Poland because a finding of probable cause may be based on the existence of a judgment of conviction in the requesting country. See Sidali v. Immigration & Naturalization Services, 107 F.3d 191, 199 (3rd Cir. 1997); Spatola v. United States, 925 F.2d 615, 618 (2nd Cir. 1991).

    6. Furthermore, **DARIUSZ TYTUS PRZYWIECZERSKI,** on his own behalf, submitted an exhibit and appendices 1-23 of documents to support his contention that there was not probable cause shown by the evidence. Those exhibits were deemed offered into evidence, but were deemed objected to based on relevancy. Those exhibits contain information that is irrelevant and immaterial to the proceedings before this court. Nonetheless, the exhibits were entered into the court file on February 9, 2018 (see Docs. S-17, S-19), and should be transmitted to the Secretary of State as part of the record in this case.

8. There is no evidence before me on which an exception from extradition can be based.

9.    **DARIUSZ TYTUS PRZYWIECZERSKI** requested that, should the court find that he is subject to extradition, the court stay the certification to the Secretary of State in order to prepare a petition for habeas corpus. That request is denied because there is no indication that a magistrate judge may stay certification. See 18 U.S.C. 3184 (noting the court "shall" certify to the Secretary of State if, "on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention").    Furthermore, even if there were such discretion, its exercise would not be appropriate because there is no basis for a successful habeas petition in this case.

THEREFORE, I certify that I have found **DARIUSZ TYTUS PRZYWIECZERSKI** extraditable to the Republic of Poland.    By prior warrant, **DARIUSZ TYTUS PRZYWIECZERSKI** has been committed to the custody of the United States Marshal for the Middle District of Florida pending the issuance of an Extradition Warrant by the United States Secretary of State for the purpose of transporting the said **DARIUSZ TYTUS PRZYWIECZERSKI** from the Middle District of Florida to the Republic of Poland to serve his sentence of imprisonment.    It is, furthermore,

-4-

ORDERED, ADJUDGED and DECREED that the transfer of physical custody of the said **DARIUSZ TYTUS PRZYWIECZERSKI** shall be at such time and place as mutually agreed upon by the United States Marshal for the Middle District of Florida and a duly authorized representative of the Republic of Poland.

The Clerk of this Court is directed to forward a certified copy of this Order to the United States Secretary of State in Washington, D.C., together with the formal extradition documents received in evidence. The Clerk shall also send a certified copy of this Order to the Attorney General of the United States in Washington, D.C.

DONE and ORDERED at Tampa, Florida, this _13th_ day of February, 2018.

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

–5–

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN THE MATTER OF THE
EXTRADITION OF

CASE NO: 8:17-mj-1811-TGW

DARIUS PRZYWIECZERSKI
_____/

## RESPONSE IN OPPOSITION TO GOVERNMENT'S MEMORANDUM OF LAW IN

## SUPPORT OF EXTRADITION

COMES now Mr. Dariusz Przywieczerski (hereinafter referred to as D.P.), through

undersigned counsel, to move this Court to deny the Government's request that D.P. be subject to

extradition and in support of such relief would argue, as detailed herein, that there is insufficient

probable cause to justify extradition. Should this Court find D.P. subject to extradition on one or

more of the Polish convictions, then he would respectfully request that this Court stay the

certification to the Secretary of State for sixty (60) days to allow for preparation of a petition for

*habeas corpus.*

Although the state of the applicable law seems to be that a fugitive may not introduce

evidence that contradicts the evidence on behalf of the requesting country, he or she may

introduce evidence explaining the submitted evidence. *Barapind v. Enomoto*, 400 F.3d 744, 749

(9th Cir. 2005). While the line between "contradictory" and "explanatory" evidence is not sharply

drawn, the purpose of permitting explanatory evidence is to afford the relator "the opportunity to

present reasonably clear-cut proof which would be of limited scope and have some reasonable

chance of negating a showing of probable cause." The extent to which a fugitive may offer

explanatory proof is largely within the discretion of the court. *Koskotas v Roche*, 931 F.2d 169 (1st Cir. 1991); *Matter of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978).

The task of defining the precise boundary between admissible 'explanatory" evidence and inadmissible "contradictory" evidence is entrusted to the sound discretion of the extradition judge. As the Court of Appeals has said, "the extraditee's right to introduce evidence is . . . 'limited to testimony which explains rather than contradicts the demanding country's proof, and its precise scope is largely in the Commissioner's discretion.'" *Shapiro v. Ferrandina*, 478 F.2d 894, 904 (2d Cir. 1973) (quoting United States ex rel. *Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963)). See also *Moghadam*, 617 F. Supp. at 781 ("the scope of evidence admitted is left to the sound discretion of the [extradition] court guided by the distinction between contradictory and explanatory evidence") (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)); *In re Extradition of Sindona*, 450 F. Supp. at 685 ("The extent of such explanatory evidence to be received is largely in the discretion of the judge ruling on the extradition request.").Whatever the precise boundary between admissible "explanatory" evidence and inadmissible "contradictory" evidence, evidence that would completely negate probable cause is admissible in an extradition hearing.

## SUMMARY OF FACTS RELEVANT TO CRIMINAL CHARGES

Beginning in 1990, under his leadership, D.P. successfully guided the privatization of UNIVERSAL, the first to occur in Poland. UNIVERSAL was one of the first Polish enterprises to be listed on the  reestablished Warsaw Stock Exchange in 1991. The Polish public was excited about the idea of private ownership, and some 42,000 individuals purchased shares in UNIVERSAL. Poles were inspired by the dynamic ideas of D.P., and UNIVERSAL was able to

use the capital to purchase unproductive Polish factories, and provide new jobs. UNIVERSAL was also co-owner of Poland's first television station, POLSAT. As Chief Executive Officer of UNIVERSAL, D.P. was responsible for the management of 30 different factories throughout Poland and more than 30,000 employees. Subsidiaries of UNIVERSAL included the newspaper Trybuna, which reported extensively on Polish politics and was perceived as "left-wing".

During the period 1989-1991, Poland was undergoing unprecedented political and economic changes. Poland's economy had been near collapse, and had billions of dollars in external debts. The Polish Government, which was struggling with the transition from communist control to a political democracy, created the Foundation for the Administration of Polish Foreign Debts (Fundusz Obslugi Zadluzenia Zagranicznego) or FOZZ, to try and pay down the billions in foreign Polish debt. Funds came to FOZZ from Polish state enterprises.

However, FOZZ was purchasing Polish debt on the secondary market, a fact that had been hidden from the international banking community. A scandal ensued and FOZZ was placed in liquidation in mid 1991. Investigators later discovered that funds belonging to FOZZ had been mismanaged, and the accounting for funds was chaotic.

FOZZ had entered into an agreement with the BEROWNE, a financial services company managed by Channel Trust in the Guernsey Islands BEROWNE handled foreign currency accounts in the Royal Bank of Scotland and other foreign banks. At that time, the Polish "zloty" was not a fully exchangeable currency. The Government, commercial enterprises and business leaders often maintained offshore foreign currency accounts.

During the Communist era, almost all import-export activities in Poland had been controlled by the Government. UNIVERSAL was one of the Polish import-export enterprises authorized to

trade in foreign currency. The allegations are that D. P. committed theft of funds belonging to

FOZZ, as the result of a loan from the Royal Bank of Scotland. The loan was made in 1990. The

prosecution in this matter did not finally commence until 1998, that is eight years after the loan

was made, and years after FOZZ had been in liquidation. Some original records had disappeared.

      The evidence in this case is that D.P. was the recipient of a lawful and legitimate loan in

September of 1990. As described previously, at that time Richard Rove was the owner of

CHANNEL TRUST (CT) , in the Guernsey Islands. Because of  favorable tax conditions,

Guernsey was an attractive location for individuals and companies. CHANNEL TRUST served

as a resident trustee for foreign-owned companies, and Mr. Rove  managed a " few hundred"

firms. One of the CHANNEL TRUST's clients was "BEROWNE".

      Mr. Rove and his BEROWNE company rendered various types of financial services and

had numerous bank accounts.  For example, BEROWNE  entered into an agreement with FOZZ

for the purpose of facilitating the repurchase of Polish debt.  However, Mr. Rove also managed

funds belonging to the UNIVERSAL Corporation, which as has been explained, required  foreign

currency for the purpose of its import operations. Mr. Rove also managed personal funds

belonging to D.P.

      As part of these financial services, Mr. Rove as Director of CHANNEL TRUST

negotiated a loan between  the Royal Bank of Scotland (RBS) and, D.P. on August  6, 1990. On

August 7, 1990, the RBS requested from Mr. Rove that the loan be secured with a cash deposit.

Mr. Rove then transferred funds from the Royal Bank of Scotland BERO-FOZZ account to a

CHANNEL TRUST nominee account, (CT Management and Guarantors, Ltd), which was to

provide a Third Party Assignment over cash deposits. This transfer occurred on September 7,

1990. When questioned by the Guernsey Police on July 8, 1994 David Ingram of the RBS was asked, "Did RBS Guernsey have the sole right to dispose of those funds before the repayment of the loan?" he responded in the affirmative. This meant that any alleged conversion of the funds occurred as of September 7, 1990.  FOZZ was in liquidation in early 1991, but as late as August 20, 1991, Mr. Rove wrote to RBS and advised that the loans were to be satisfied from the security deposit.  Rove later wrote in December 1991 to David Ingram, asking that surplus monies be paid to CT Nominees account.

The prosecutor's theory was that funds belonging to FOZZ were used to collateralize the loan to D.P. However, Rove was grossly negligent in how he handled his accounts, and admitted to commingling funds belonging to different enterprises.  For example, he admitted at trial that at least once or twice funds from the BERO-FOZZ  account were used to compensate payments from other accounts.  At the same time, Mr. Rove testified that different Polish entities provided funds to the FOZZ account, including UNIVERSAL.

There was no documentation to prove that funds "belonging" to FOZZ had been converted by D.P.  In fact, the only funds that were provided to D.P came from the Royal Bank of Scotland. Any inappropriate movement or commingling was the responsibility of Mr. Rove, who later admitted that he could not account for $10,000,000 belonging to FOZZ. The primary witness in the case was Richard Rove, the Director of Channel Trust. He had been questioned in Warsaw during the investigation in 1992,  in the Guernsey Island in 1994, and then again in Warsaw in 1997.  He testified at trial that he managed hundreds of companies for CHANNEL TRUST. He testified in 2003 and then again in 2004.  His testimony regarding FOZZ contained major inconsistencies, and contradicted the statements he made in a sworn affidavit to the Court in the

Guernsey Island.

Mr. Rove's motivation in testifying against the defendants and on behalf of the prosecution was apparent by the fact that FOZZ in liquidation had a claim against Mr. Rove for nearly $10,000,000 in funds missing from the BEROWNE account he managed on behalf of FOZZ. In September 2002, Polish government liquidators of FOZZ agreed to withdraw its claim against Mr. Rove for the missing funds. This agreement appears to pre-date Mr. Rove's testimony in D.P.'s trial.

In addition, there were political implications of the FOZZ affair. An accusation had been made that FOZZ funds had been used to help create and finance the political party, Porozumienic Centrum (PC), which was the predecessor of the Prawo I Sprawiedliewosc (PiS).

In 2001 Polish TV broadcast a documentary suggesting that FOZZ funds had benefitted the PC. At the conclusion of the trial, Judge Kryze took the opportunity of the trial verdict to make statements vindicating the PiS, although the issue was clearly irrelevant to his verdict.

## PROCEDURAL HISTORY IN POLAND

On January 16, 1998 the district prosecutor's office in Warsaw filed an indictment against six defendants, including D.P. This prosecution and trial became known as the "FOZZ affair". The prosecution was essentially a complex commercial fraud or white collar crime case. D.P. was accused of misappropriating funds, as a result of which financial resources belonging to the Fund for Foreign Debt Service (FOZZ) were taken over by the Royal Bank of Scotland. D.P. steadfastly denied the allegations throughout his trial and appellate process.

The legal proceedings started on December 6, 2000. That trial was then terminated in October 2001 when Judge Piwnik, chief justice of the bench, was appointed Minister of Justice

in Poland. Almost a year later, September 30, 2002, Judge Andrzej Kryze (A.K.) became the presiding judge over the prosecution. Unfortunately for D.P., Judge A.K. was not impartial and D.P. did not receive a fair trial. Three years later Judge A.K. ultimately found D.P. guilty on two counts.

Judgement was entered on March 29, 2005. A year later, the Court of Appeal upheld the district court judgement on the first count of conviction. On the second count of conviction, a Polish court of appeals initially ruled that a violation of Article 6 of the European Convention on Human Rights had taken place, due to the lack of impartiality by Judge A.K. The proceedings with respect to the second charge were temporarily discontinued. More appellate litigation followed before the Constitutional Tribunal and the Supreme Court [1]. In the end, the Supreme Court of Poland finally ruled against D.P. Ultimately, D.P.'s judgement and conviction on both counts became final in 2010. D.P. exhausted all of his legal remedies under Polish law. D.P. therefore filed an application of appeal before the European Court of Human Rights.

<u>ISSUES BEFORE THE EUROPEAN COURT OF HUMAN RIGHTS</u>

D.P. has filed an application before the European Court of Human Rights (ECHR) which is still pending.[2] In the application D.P. has argued that he did not have the benefit of a fair trial according to Article 6 of the European Convention on Human Rights because (1) there was a violation of the principle of the independence and impartiality of the court; (2) there was a

---

[1] The appellate history and rulings of D.P.'s criminal case in Poland are detailed thoroughly in sections 5-13 of D.P.'s application to the ECHR.

[2] The ECHR is an international court established to recognize complaints presented by people who claim the infringement of their rights guaranteed in the Convention of Human Rights and Basic Freedoms (Convention). In case of "loss of confidence" to the system of justice in a country, a person has a right to lodge a complaint with the ECHR.

violation of the fairness of the proceedings; and (3) there were clear violations of due process and the applicable statute of limitations. These arguments are thoroughly briefed in D.P.'s application to the ECHR.

Essentially, D.P. argues that his criminal trial was conducted by a presiding judge, Andrzej Kryze (A.K.), that was not impartial and who was subjectively and objectively biased. The obvious lack of impartiality of Judge A.K. was highlighted by the position he held as an advisor to a Polish parliamentary commission with strong political views in relation to white collar crime. Indeed Judge A.K. was biased because he actively cooperated with others to create a law that retroactively reversed the statute of limitations, explicitly targeted at the FOZZ case, while in the same period acting as the presiding district court judge for that particular criminal trial [3]. Suffice it to say that this would never happen in the United States of America.

It is alleged that Judge A.K. was transferred from the 10th penal department to 8th, the jurisdiction presiding over the FOZZ investigation, solely to handle the FOZZ case in a blatant abuse of the established procedure in Polish courts of neutral assignment of criminal cases. A neutral system had been established by Polish law to prevent what we colloquially call here in the United States of America as "judge/forum shopping".

Thus, inappropriately appointed, Judge A.K. – during the FOZZ proceedings over which he presided – also held the post of legal-political advisor and worked on regulations aimed at strengthening penalties in white collar crime cases.  Directly after issuing the judgement and

---

[3] "If not for the change to the law in question, the penal proceedings against DP for the offenses covered by the sentence which is to be executed following the extradition of DP by the U.S.A would have been dismissed because of the lapse of the period prescribed by the statute of limitations" – D.P. Exhibit A: Legal Conclusions of Marcin Kolasicski, note 20.

sentence against D.P., A.K. returned to his original judicial division. The dual participation of Judge A.K. as a magistrate and legislative advocate violated the European Convention on Human Rights, as Judge A.K. was not an impartial or independent magistrate. While the same facts would likely never exist in an American court, there is no dispute that A.K. was a consultant to the Polish Parliament and the Party seeking legislation directed at adversely affecting D.P.

According to the ECHR's authoritative case law regarding the impartiality of the courts or tribunals due regard must be had to the manner of appointment of its members and their term of office, the existence of guarantees against outside pressures and whether the court presents an appearance of independence. There are two aspects in order to establish whether a tribunal can be considered to be impartial. Firstly the Judges must be free of personal prejudice or bias, the subjective test. Secondly, the court must also be impartial from an objective viewpoint. It must be seen to offer sufficient guarantees to exclude any legitimate doubt in this respect. These two concepts, personal independence and objective impartiality, are closely related. *Piersack v. Belgium,* ECHR 1 October 1982, 8692/79; *De Cubber v. Belgium*, ECHR 26 October 1984, 9186/80; *Hauschildt v. Denmark*, ECHR 24 May 1989, 10484/83.

As explained in D.P.'s application to the ECHR, the due process and statute of limitations violations, infringements of Article 7 of the Convention, occurred when "a retroactive application of a stricter criminal law and, in particular, Art. 1 pt. 1a and Art. 1 pt.2 of the law of 3 June 2005 on a change to the Law – Criminal Code (Journal of Laws No. 132, Item 1109) not only being effective on the date of the act but passed and enacted after the delivery of the judgement of the trial court of the first instance for the needs of this particular trial although late effective also for other proceedings."

According to the Convention these violations would be considered both procedural and substantive because: (1) criminal law provisions cannot be interpreted to the detriment of a defendant; (2) inter-temporal guarantees are deemed to be an essential component of the principle rule of law; and (3) the guarantees are broadly understood, that is they are applied to the entirety of the legal and criminal reaction, i.e. also to the time of the adjudication and not only to the criminal assessment of the unlawfulness of an act at the time of its commitment. The Polish legislature violated these longstanding rules of law and D.P. was adversely affected as a direct result. Other due process violations alleged that the court refused to allow D.P.'s defense to utilize certain experts material to his defense and also issued a legally insufficient appellate opinion which was too brief and generalized for adequate review.

One statement in opposition to the newly created change to Polish law, attributed to members of the legal/scientific community on Polish penal law, best sums up the legislation to change the statute of limitations for the FOZZ prosecution and the use of law for immediate political purposes:

> What must arouse stark objection is the extension of the periods of limitation for the prosecution of a crime adopted for one particular criminal case, the so-called "Lex Fozz". This constitutes dangerous precedent. The criminal code is changed to settle one specific case in one specific way. This violates the principle of the stability of law which is a constitutional principle as regards the code. What is violated is the principle, observed in the civilized countries since the time of the Enlightenment, that law does not act retroactively.

Page 10 of  12

## SUMMARY OF EXHIBIT "A" AND APPENDIX

In preparation for filing this response in opposition to extradition, undersigned counsel has been assisted by a lawyer in Warsaw, Poland, Marcin Kolasicski. Attached as Exhibit "A" is a position piece by Mr. Kolasicski titled "A Stance on the Application of the Republic of Poland to Extradite DP for the Purpose of Executing the Penalty of Imprisonment". Attached to the Exhibit is an appendix with multiple documents which are relevant to the arguments made by counsel in this response in opposition, such as: D.P.'s application to the ECHR (Appendix 1,2); legal opinions on the merits of D.P's claims before the ECHR (Appendix 6,7); criticism to the change in Polish law (Appendix 17, 18); and news articles regarding attacks on the judiciary and democracy in Poland (Appendix 23), to name just a few. Because the extent to which a fugitive may offer explanatory proof is largely within the discretion of the court, D.P. respectfully requests that this Court receive Exhibit "A" and the appendix for due consideration in determining whether there is sufficient probable cause to justify extradition and certification to the Secretary of State. *See Koskotas v Roche*, 931 F.2d 169 (1st Cir. 1991); *Shapiro v. Ferrandina*, 478 F.2d 894, 904 (2d Cir. 1973). [4]

Because there is a high degree of likelihood that D.P. will prevail before the ECHR, a favorable result for D.P. before that tribunal would nullify his Polish convictions. Any potential retrial in Poland on the criminal allegations would then be time-barred by the applicable statue of limitations. With no viable prosecution, the Warsaw criminal court would then lack jurisdiction

---

[4] D.P. is aware of the "Rule of Non-Inquiry"and that much of what he wishes to advocate must be presented to the Secretary of State. *Prasporat v. Benov*, 421 F.3d 1009 (9th Cir. 2005); *Ahmad v. Wigen*, 910 F.2d 1063 (2nd Cir. 1990).

over D.P. Therefore, this Court should find insufficient probable cause to subject D.P. to

extradition and deny certification to the Secretary of State.

                  Respectfully submitted,

                  S/ Nicholas G. Matassini
                  Nicholas G. Matassini, Esquire
                  Florida Bar Number: 737704
                  ngm@matassinilaw.com
                  The Matassini Law Firm, P.A.
                  2811 W. Kennedy Blvd.
                  Tampa, Florida 33609
                  Telephone (813) 879-6227
                  Facsimile (813) 873-2209
                  CJA Counsel for Defendant

## CERTIFICATE OF SERVICE

        I hereby certify that on February 5, 2018 a copy of the foregoing was filed electronically.

Notice of this filing will be sent by operation of the Court's CM/ECF system to all parties

indicated on the electronic filing receipt. Parties may access this filing through the Court's

CM/ECF system.

Dated : February 5, 2018

                  S/ Nicholas G. Matassini
                  Nicholas G. Matassini, Esquire
                  Florida Bar Number: 737704
                  CJA Counsel for Defendant