IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DARIUSZ PRZYWIECZERSKI,
Applicant,

CASE NO: 8:18-cv-468-T-23JSS

v.

UNITED STATES OF AMERICA
Respondents.

_____/

## DARIUSZ PRZYWIECZERSKI'S REPLY TO THE HABEAS CORPUS RESPONSE BY

## THE UNITED STATES OF AMERICA

The Habeas Corpus Applicant, DARIUSZ PRZYWIECZERSKI, replies in opposition to the response filed by the United States of America in this matter. Applicant reminds this Court he is currently in the custody of the Pinellas County jail in Clearwater, Florida. Applicant is in ill health and defending against his unlawful extradition to Poland – a country where, currently, the constitutional safe-guards to the preservation of civil liberties and the independence of the judiciary are eroding, along with freedom of the press and other Polish democratic institutions.

The Applicant was rejected bail but has lived openly in the Middle District of Florida for over a decade. He has always been prepared to surrender to any lawful arrest warrant. On May 19, 2007, prior counsel for the Applicant wrote to the Department of International Affairs, United States Department of Justice and essentially offered up the Applicant for arrest and extradition. A copy of the letter sent to the Department of Justice and to the Presiding Chief Judge in Orlando, Florida has been attached to previous court filings in the underlying extradition matter and is part of the court record. Undoubtedly, the United States Government and the Polish Government

have been aware of the Applicant's whereabouts for some time and can hardly make assertions to the contrary. Applicant owns his own home in Hillsborough County, Florida and his name is currently listed as the registered owner of 5709 Sea Turtle Place, Apollo Beach, Florida 33572. He has owed that residence for at least seven years.

The United States argues this Court should not consider any relief on this habeas petition on humanitarian and medical grounds because a U.S. statute of law declares it so. However, the United States has long recognized exceptions to extradition law including the political offense exception to extradition and the prohibition against sending a person to a foreign jurisdiciton known to administer cruel and unusual punishment. As the attachments to the Applicant's reply show, the Applicant was not convicted by a properly convened court of law in Poland and indeed suffered great injustice throughout this whole affair.

Furthermore, the U.S. magistrate did not arrive at a reasoned conclusion when it rendered its probable cause and extradition decision. The magistrate committed error when he refused to receive into evidence and analyze Applicant's exhibits at the extradition hearing. Applicant's exhibits were entered into the record but not allowed into evidence. Applicant was prejudiced by this ruling as the Court would have learned about the political and humanitarian issues in Poland that warrant consideration in a decision on extradition.

## APPLICANT'S PHYSICAL AND MEDICAL CONDITION SHOULD PROHIBIT HIS EXTRADITION TO POLAND

Applicant's various medical ailments were made part of the record in this case and the United States did not contest that the Applicant suffered from three heart attacks, a stroke, and also continues to suffer from diabetes, hyperlipidemia, hypertension, a peptic ulcer,

cardiomyopathy, and significant hearing loss – all resulting in a careful regimen of medication that may not be readily available in Poland. This applicant has reasonable grounds to fear that his medical condition will not be properly cared for in Poland's prison system. Applicant has no received no assurances to the contrary.

As such, Applicant requests that this Court hold a specific hearing wherein the United States would be required to show reasonable assurance to this Court that (1) Poland is aware of the Applicant's physical and medical conditions and (2) that Poland is able to properly and humanely care for him. Clearly such an issue raises the prospect for the United States to be complicit in cruel and unusual punishment should Applicant be subject, as is expected, to such treatment abroad in Poland. Absent this United States District Court conducting a special hearing on the matter, the Applicant's due process rights will be substantially infringed upon. Applicant is in custody at the Pinellas County Jail and has no viable ability to make such a showing on his own given his incarceration.

<u>DO NOT SEND APPLICANT TO POLAND, DEMOCRATIC INSTITUTIONS ARE CRUMBLING AND INJUSTICE ABOUNDS – NOT EVEN IRELAND WILL SEND A WANTED SUSPECT THERE</u>

In December of 2017, the European Union ("EU") commission launched an unprecedented Article 7 disciplinary procedure against Poland because the judicial overhaul represented a systematic threat to the rule of law in Poland, an EU member state. The EU warned that the government in charge in Warsaw must change track. The EU charged that the Law and Justice government (ruling party in Poland) wanted to put the judiciary under political influence. As a result, the EU has sent four sets of recommendations to Warsaw over the past two years, but

the Polish government has been reluctant to engage. Among the recent attacks on democratic principles in Poland were sweeping changes to the independent judiciary – which give politicians greater power over the body that appoints judges, and will force about 40 per cent of supreme court judges to step down.

The reforms bring the National Council of the Judiciary, a formerly self-governing body, under full control of the Polish parliament in violation of EU principles. A new law forces nearly 40 percent of the Supreme Court's judges in Poland into early retirement and creates a retroactive mechanism for "extraordinary review" of final judgments. With the average age of judges now at around 40, the efforts to bring the judiciary under control of the rule of the majority cannot conceivably be about taking levers of power out of post-communist hands, as Law and Justice claims.

The ruling party in Poland, the populist Law and Justice party (PiS), has launched a widening campaign to dismantle Poland's democratic checks and balances on the government. The party was co-founded and chaired by former Prime Minister Jaroslaw Kaczynski. Since winning a majority in 2015, PiS deputies have effectively turned the country's state media into a propaganda arm, purged the army's leadership, placed loyalists in the civil service and weakened the Constitutional Tribunal which rules on whether legislation violates Poland's constitution.

Recently, an Irish court refused to send a suspect back to Poland because of the dramatic, anti-democratic changes to the justice system. A High Court judge in Ireland referred a Polish extradition case to the European Court of Justice on Monday because Poland's recent judicial reforms mean its "common value of the rule of law" has been "systematically damaged," the Irish Times reported.

Artur Celmer, a Polish national, was arrested in Ireland under a European Arrest Warrant for drug trafficking last May. Celmer's lawyers opposed their client's extradition to Poland in light of significant changes to Poland's judiciary, which they claimed undermine its independence and jeopardize cooperation on warrants. Irish High Court Justice Aileen Donnelly found that Poland's "immense" legislative changes have "systematically damaged" the rule of law and "seriously undermined" the independence of its judiciary and the legitimacy of its constitutional court.

"The constitutionality of Polish laws can no longer be effectively guaranteed," Donnelly said, adding that "respect for the rule of law is essential for mutual trust in the operation of the European Arrest Warrant" process.

The government and president Andrzej Duda, a former Law and Justice MEP, have also been accused of coordinating a campaign to capture Poland's constitutional tribunal, Poland's highest constitutional court. Referring to "what appears to be the deliberate, calculated and provocative legislative dismantling by Poland of the independence of the judiciary, a key component of the rule of law," Donnelly said that if Celmer were to be returned to Poland, "he will be returning to face trial in a jurisdiction where the minister for justice is now the public prosecutor and is entitled to play an active role over the presidents of courts. This has the potential for a chilling effect on those presidents."

## APPLICANT REQUESTS RELIEF FROM THIS COURT BECAUSE THE RULE OF NON-INQUIRY IS A VIOLATION OF DUE PROCESS AND CONTRARY TO REASONED LAW

A United States Court of Law must be able to address legal issues by a person detained within its borders. The Applicant owns property in Hillsborough County, Florida and has paid

taxes here. Therefore, on principles supported by the Founding Fathers this Applicant can avail himself of the rule of law in the United States through the judicial branch – which has become a symbol of justice throughout the world.

Applicant argues that the magistrate committed fundamental error by precluding from receipt, in evidence and consideration, his exhibits submitted at the extradition hearing. The exhibits are part of the Court record but were not considered by the magistrate. The Applicant sustained prejudice as a result of the magistrate's erroneous legal conclusion. But for the magistrate's error, the result of the extradition hearing would have been different – i.e . no certificate of extradition would have been ordered.

As to the rule of non-inquiry cited by the United States, Applicant is deeply concerned that his due process rights will be violated by the Executive Branch because the Department of the Secretary of State – which now sits without an appointed, active Secretary of State – much like the United States Department of Justice, is controlled by President Donald Trump. All the while Trump has ironically hailed Poland for its "democratic values" during a previous foreign policy speech in Warsaw – where tens of thousands of Polish citizens protested across the country against the ruling Law and Justice (PiS) party's erosion of the judiciary's independence. Certainly Lady Justice and the legal evolution of the rule of non-inquiry did not foresee the Trump administration.

Courts usually describe the rule of non-inquiry as a formal proposition: courts should not look at what the receiving country will do because this issue is not part of the habeas inquiry and U.S. law does not apply to foreign practices, and perhaps also because foreign sovereigns are immune from scrutiny. This proposition receives additional contemporary support from

assertions that courts are unable to assess foreign practices and must defer to executive primacy in foreign affairs. Applicant argues that each piece of this doctrinal structure is vulnerable or simply incorrect. Applicant thus argues that judicial statements about foreign affairs in extradition cases do not rest on any kind of measured assessment of extradition doctrine or of the proper scope of foreign affairs deference in the extradition context. One must rhetorically ponder how can a federal court in a extradition matter claim incompetence, when in an immigration matter the task is performed routinely? See for comparison: Mironescu v. Costner, 480 F.3d 664, 671-72 (4th Cir. 2007); Kester, supra note 1, at 1481.

For example, federal courts of appeals review the factual findings of Article I immigration courts on the question whether an alien faces "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" such that he or she is eligible for asylum. See U.S.C. § 1101(a)(42)(A) (2006); and 8 U.S.C. § 1252 (2006); also Ahmed v. Keisler, 504 F.3d 1183, 1191 (9th Cir. 2007). Similar review exists for claims for withholding of removal based either on a threat to the alien's "life or freedom . . . because of the alien's race, religion, nationality, membership in a particular social group, or political opinion. See 8 U.S.C. § 1231(b)(3)(A) (2006).

In at least two other contexts, federal courts consider the past or ongoing actions of foreign government officials despite the foreign policy concerns that such inquiries raise. The Alien Tort Statute (ATS) allows suits "by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States" and ATS cases frequently implicate the actions of foreign officials. See 28 U.S.C. § 1350 (2006).The Torture Victim Protection Act (TVPA) provides a civil cause of action against "[a]n individual who, under actual or apparent authority,

or color of law, of any foreign nation" subjects an individual to torture or extrajudicial killing. See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 254-56 (2d Cir. 2009) (addressing claims that the Republic of Sudan committed genocide); Sarei v. Rio Tinto, PLC, 487 F.3d 1193, 1197 (9th Cir. 2007), vacated, 499 F.3d 923 (9th Cir. 2007), remanded, 550 F.3d 822 (9th Cir. 2008) (en banc) (finding that some claims by Papua New Guinea residents of violations of international law by non-U.S. actors can be heard in United States courts). See also Torture Victim Protection Act, Pub. L. No. 102–256, § 2(a), 106 Stat. 73 (1992) (Historical and Revision Notes) (codified as amended in 28 U.S.C. § 1350 (2006).

This Court must note as well that in immigration cases, courts engage in this factual review notwithstanding the fact that an immigration judge and the Board of Immigration Appeals have already considered the facts of the case. Under the rule of non-inquiry, by contrast, the Secretary of State considers human rights issues on an essentially ad hoc basis, with no structured opportunity for the habeas applicant to present arguments. As the Ninth Circuit Court noted in Lopez-Smith v. Hood 121 F.3d 1322, 1326 (9th Cir. 1997):

> We suppose there is nothing to stop Lopez-Smith's lawyer from putting together a presentation showing why the Secretary ought to exercise discretion not to extradite Lopez-Smith, and mailing it to the Secretary of State. As for whether the Secretary of State considers the material, and how the Secretary balances the material against other considerations, that is a matter exclusively within the discretion of the executive branch.

Although extradition from the United States is different from cases involving immigration, the ATS, and the TVPA because it involves direct dealings between the U.S. State Department and officials of the requesting country, where the topic of their exchanges is

enforcement of the requesting country's criminal law – an area generally thought to sit at the heart of sovereign power. Conceding this point, however, does not undermine the inherent competence of federal courts to make inquiries that are essentially the same as the ones they make in other areas. Thus, Applicant argues that significant fundamental due process issues are raised regarding the question of the extent to which foreign affairs concerns should prevent federal courts from engaging in judicial review of issues that include human rights claims and other humanitarian issues.

The practices of other countries are also relevant to the international law status of the rule of non-inquiry. Courts in many countries recognize some version of the rule, but several countries, including Canada, Germany, Ireland, the Netherlands, and the United Kingdom, allow inquiry in certain circumstances, such as when the extraditee's human rights are at risk. Indeed, a series of European Court of Human Rights decisions forbids parties to the European Convention from extraditing or deporting a person to a country if there are substantial grounds for believing he or she would be subjected to torture or to cruel, inhuman or degrading treatment. See, e.g., Soering v. United Kingdom, 161 Eur. Ct. H.R. (ser. A) at 34-36 (1989); see also Kaboulev v. Ukraine, No. 41015/04 Eur. Ct. H.R., at ¶¶ 107, 112 (Nov. 19, 2009) http://www.echr.coe.int ("[T]he Court accepts the applicant's contention that the mere fact of being detained as a criminal suspect [in Kazakhstan] . . . provides sufficient grounds to fear a serious risk of being subjected to [torture or inhuman or degrading punishment] contrary to Article 3 of the Convention."); GEOFF GILBERT, RESPONDING TO INTERNATIONAL CRIME 149-59, 163-67 (2006) (in one case, "[r]eports from the Committee Against Torture and the European Committee for the Prevention of Torture were cited in the successful attempt to block extradition to Russia of [a]

Chechen leader"); WHITE & OVEY, supra note 144, at 172, 179-82.

Many European countries rely on diplomatic assurances to satisfy their obligations, but those assurances are generally subject to judicial review, and the European Court of Human Rights has insisted that courts must review assurances to determine whether they provide "a sufficient guarantee that the applicant would be protected against the risk of treatment prohibited by the Convention." See Saadi v. Italy, No. 37201/06 Eur. Ct. H.R., at ¶ 148 (Feb. 28, 2008), http://www.echr.coe.int; see also Kaboulev, No. 41015/04 Eur. Ct. H.R. at ¶ 108; Soering, 11 Eur. Ct. H.R. (ser. A) at 36-39; GILBERT, supra note 146, at 159-63.

In a most robust and unwavering position by the United States, it is specifically stated national policy not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States. See Foreign Affairs Reform and Restructuring Act, 8 U.S.C. § 1231 (2006).

This Applicant argues that substantial due process rights protected by the United States Constitution are at issue because extradition is part of the criminal process; it does not take place unless the requesting country has charged the habeas applicant with a crime. And, from this Applicant's point of view, the extradition process began with his arrest and imprisonment in Pinellas County jail. It is reasonable for any learned jurists to conclude that in its most basic components extradition is also quintessentially a judicial process under U.S. law, despite the executive functions of review and surrender.

As a matter of both domestic and international law, the criminal process triggers *heightened* due process concerns relating to arrest and detention. Those concerns heighten further

when one adds the likely result of extradition – being forcibly removed from the United States and therefore being placed beyond the jurisdiction of its courts. Further, Applicant argues judicial review of the executive's decision to extradite should be available as a matter of basic due process, as well as international law. See Sayne v. Shipley, 418 F.2d 679, 686 (5th Cir. 1969); see also Gerstein v. Pugh 420 U.S. 103, 114, 116-18 (1975); Khouzam v. Attorney Gen., 549 F.3d 235, 255-59 (3d Cir. 2008).

Applicant was therefore denied his due process right to a fair and thorough hearing and Applicant suffered substantial prejudice as a result. Clearly the outcome of the extradition hearing would have been different had the magistrate considered the exhibits submitted on Applicant's behalf.

WHEREFORE the Applicant respectfully requests that this United States District Court grant habeas relief and (1) consider Applicant for release from Pinellas County jail on bond; (2) remand the matter back to the magistrate with instruction to consider all of the exhibits submitted by Applicant at the extradition hearing; (3) conduct an evidentiary hearing wherein the United States would be required to present evidence that Poland is aware of the Applicant's physical and medical condition and has the ability to properly care for the Applicant consistent with international law and that care mandated by the European Union; and (4) order any other relief the Court deems within the interests of justice and humanity.

## CERTIFICATE OF SERVICE

I, DARIUS PRZYWIECZERSKI, hereby certify that on April 30, 2018 a copy of this reply brief and its attachments was mailed via U.S. Postal Service through the Pinellas County jail and addressed to the Clerk of Court for the Middle District of Florida 801 North Florida Avenue, Tampa, Florida 33602 and to the Honorable Megan K. Kistler, Assistant United States Attorney, 400 N. Tampa Street, Suite 3200.

Dated : April 30, 2018

_____
DARIUS PRZYWIECZERSKI