Exhibit A



EUROPEAN COURT OF HUMAN RIGHTS
COUR EUROPÉENNE DES DROITS DE L'HOMME

ONTVANGEN 1 7 APR. 2018

T : +33 (0)3 88 41 20 18
F : +33 (0)3 88 41 27 30
www.echr.coe.int

Ms Caroline L.A. de Sitter
Advocaten
Sjöcrona - Van Stigt
Postbus 85770
NL - 2508 CL Den Haag

**FIRST SECTION**

ECHR-LE20.2cR
IK/mwe

12 April 2018

**Application no. 38433/07**
**Przywieczerski v. Poland**
**Joined to application no. 36661/07 – Chim v. Poland**

Dear Madam,

In accordance with Rule 77 §§ 2 and 3 of the Rules of Court, I enclose a copy of the Chamber's judgment in the above application. This notification constitutes delivery of the judgment.

The judgment is now available on the Court's Internet site (www.echr.coe.int).

I would draw your attention to the circumstances in which the judgment will become final (Articles 42 and 44 § 2 of the Convention). Please note that any request for the referral of this judgment to the Grand Chamber must be duly reasoned and reach the Registry within three months of today's date (see *Kovačič and Others v. Slovenia* [GC], nos. 44574/98, 45133/98 and 48316/99, § 197, 3 October 2008), i.e. before 12 July 2018 at midnight (Central European Time). Where no request has been received the judgment will become final at midnight on the same day. If the applicant's case is arguably "exceptional" and raises a "serious question" within the meaning of Article 43 of the Convention and she wishes it to be referred to the Grand Chamber, her request must be submitted in one of the official languages of the Court, English or French, unless leave has been sought from and granted by the President of the Section to use another language.

Yours faithfully,

Abel Campos
Section Registrar

Enc.: Judgment

EUROPEAN COURT OF HUMAN RIGHTS
COUNCIL OF EUROPE
67075 STRASBOURG CEDEX
FRANCE

COUNCIL OF EUROPE
CONSEIL DE L'EUROPE

COUR EUROPÉENNE DES DROITS DE L'HOMME
CONSEIL DE L'EUROPE
67075 STRASBOURG CEDEX
FRANCE



EUROPEAN COURT OF HUMAN RIGHTS
COUR EUROPÉENNE DES DROITS DE L'HOMME

FIRST SECTION

## CASE OF CHIM AND PRZYWIECZERSKI v. POLAND

*(Applications nos. 36661/07 and 38433/07)*

JUDGMENT

STRASBOURG

12 April 2018

*This judgment will become final in the circumstances set out in Article 44 § 2 of the Convention. It may be subject to editorial revision.*



COUNCIL OF EUROPE
CONSEIL DE L'EUROPE

**In the case of Chim and Przywieczerski v. Poland,**

The European Court of Human Rights (First Section), sitting as a Chamber composed of:

Linos-Alexandre Sicilianos, *President,*
Kristina Pardalos,
Aleš Pejchal,
Krzysztof Wojtyczek,
Armen Harutyunyan,
Tim Eicke,
Jovan Ilievski, *Judges,*

and Abel Campos, *Section Registrar,*

Having deliberated in private on 20 March 2018,

Delivers the following judgment, which was adopted on that date:

## PROCEDURE

1. The case originated in two applications (nos. 36661/07 and 38433/07) against the Republic of Poland lodged with the Court under Article 34 of the Convention for the Protection of Human Rights and Fundamental Freedoms ("the Convention") by two Polish nationals, Ms Janina Irena Chim ("the first applicant") and Mr Dariusz Tytus Przywieczerski ("the second applicant"), on 14 and 11 August 2007 respectively.

2. The first applicant was represented by Mr P. Kruszyński, a lawyer practising in Warsaw. The second applicant was represented by Ms C.L.A. de Sitter and Ms S.S.S. Heinerman of Sjöcrona Van Stigt Attorneys, a law firm based in the Hague. The Polish Government ("the Government") were represented by their Agent, Ms J. Chrzanowska, of the Ministry of Foreign Affairs.

3. The applicants alleged, in particular, that a judge had been assigned to examine their case in violation of domestic law, and that he had lacked impartiality. They also complained about the enactment of a law extending limitation periods.

4. On 10 November 2014 the applications were communicated to the Government.

# THE FACTS

## I. THE CIRCUMSTANCES OF THE CASE

5.  The first applicant was born in 1950 and lives in Warsaw. The second applicant was born in 1946 and lives in Apollo Beach, Florida, United States of America.

### A. Foreign Debt Service Fund ("the FOZZ")

6.  The Foreign Debt Service Fund (*Fundusz Obsługi Zadłużenia Zagranicznego* – "the FOZZ") was established by the Law of 15 February 1989, which entered into force on 21 February 1989. It was a legal entity whose liabilities were guaranteed by the State Treasury. The task of the FOZZ was to collect and manage the funds earmarked for servicing Poland's foreign debt. Those funds were to be used to repay Poland's foreign debt.

7.  The FOZZ was managed by its Director General, who had statutory authority to independently represent the Fund and enter into contracts on its behalf. The first applicant was initially appointed Head of Domestic Operations and later Deputy Director General of the FOZZ. The second applicant was the Managing Director and Chairman of the Board of Directors of the Universal Foreign Trade Company based in Poland.

### B. Criminal proceedings against the applicants

8.  Criminal proceedings were instituted following a complaint lodged by J.T., a German national, at the Polish Consulate in Cologne.

9.  An investigation was opened on 7 May 1991. On 18 February 1993 the Warsaw Regional Prosecutor filed a bill of indictment with the Warsaw Regional Court. He charged the first applicant and another individual, K.K., with misappropriation of public property and mismanagement. On 27 September 1993 the court decided to return the bill of indictment to the prosecutor so that certain shortcomings in the investigation could be rectified.

10. On 19 January 1998 the prosecutor filed an updated bill of indictment with the Warsaw Regional Court.

11. The first applicant was charged with misappropriation of the FOZZ's property of a considerable value committed with other persons as a continuous offence between March 1989 and February 1991. She was further charged with failure to perform her duties to the detriment of the FOZZ.

12. The second applicant was charged with misappropriation of 1,557,178.05 US dollars (USD) to the detriment of the FOZZ committed with other persons as a continuous offence between July and September 1990.

13. There were five other accused in the case.

### 1. Trial (case no. VIII K 37/98)

14. In February 1999 the applicants' case was assigned to Judge B.P. The trial started on 4 October 2000 and a number of hearings were held until October 2001. On 19 October 2001 Judge B.P. was appointed Minister of Justice and consequently the whole trial had to be restarted.

15. On 19 October 2001 the President of the 8th Division of the Warsaw Regional Court asked the President of the Regional Court to assist the Division in finding a Regional Court judge from the appellate divisions who could hear the applicants' case. He stated that, owing to a lack of judges and the volume of work in the 8th Division, there were no judges who could examine the case in question swiftly.

16. On 6 November 2001 the President of the Regional Court referred the request to the Board of the Regional Court (kolegium Sqdu Okręgowego). She informed it that one of the judges, Judge A.K., had not agreed to a proposal by the management of the court to be transferred to the 8th Division to examine the FOZZ case. However, Judge A.K. stated that he would go if the Board took a decision in that regard.

17. On 6 November 2001 the Board unanimously decided to transfer Judge A.K. from the 10th Appellate Division to the 8th Criminal Division with effect from 15 November 2001. It further decided to assign him to case no. VIII K 37/98. In a letter of 7 November 2001 the President of the Regional Court informed Judge A.K. of that decision.

18. On 22 November 2001 the President of the 8th Criminal Division assigned Judge A.K. to case no. VIII K 37/98 "in accordance with the decision of the Board of the Warsaw Regional Court".

19. The new trial bench was composed of Judge A.K., acting as president, and two lay judges. A substitute judge and two substitute lay judges were also assigned to the case.

20. The first hearing before the new bench was set for 30 September 2002. On that date Judge A.K. allowed journalists to record images and the identities of the defendants. He stated on that occasion that "there are forty million victims in this case, and society has the right to have images and personal information about the defendants".

21. There were 224 hearings held in the trial court. Some 314 witnesses were heard, and a number of expert accounting reports and more than 1000 documents were examined. The files of the case were very voluminous.

22. On 8 February 2005 the trial court finished hearing evidence in the case.

23. On 29 March 2005 the Warsaw Regional Court delivered its judgment. Judge A.K. presented the main reasons for the verdict orally.

24. The trial court convicted the first applicant of misappropriation of the FOZZ's property of a considerable value committed with other persons between March 1989 and December 1991 (Article 284 § 2 in conjunction with Articles 12 and 294 § 1 of the Criminal Code). The trial court held that, in her capacity as Head of Domestic Operations and later Deputy Director General, she had misappropriated a total of USD 3,779,835.75 from the FOZZ for the benefit of herself and other entities (point III of the operative provisions of the judgment). With regard to that offence, the court sentenced her to five years' imprisonment and a fine.

25. The trial court further convicted the first applicant of failure to perform her duties and of exceeding her authority between March 1989 and July 1990 (Article 217 § 2 in conjunction with Article 4 of the Criminal Code of 1969). As a result of those failings the FOZZ had suffered damage of no less than 21,068,680.58 Polish zlotys (PLN) (point IV of the operative provisions of the judgment). With regard to that offence, the trial court sentenced her to three years' imprisonment and a fine.

26. The trial court convicted the second applicant of misappropriation of the FOZZ's property of a considerable value (USD 503,000) committed with other persons (Article 284 § 2 in conjunction with Article 294 § 1 of the Criminal Code, point VI.1 of the operative provisions of the judgment). With regard to that offence, the trial court sentenced him to two and a half years' imprisonment and a fine.

27. It further convicted the second applicant of theft of the FOZZ's property of a considerable value (USD 1,074,120) committed with other persons (Article 278 § 1 in conjunction with Article 294 § 1 of the Criminal Code, point VI.2 of the operative provisions of the judgment). With regard to that offence, the trial court sentenced him to two and a half years' imprisonment and a fine.

28. The trial court gave the first applicant a cumulative sentence of six years' imprisonment and the second applicant a cumulative sentence of three and a half years' imprisonment and a fine. The trial court ordered the applicants to compensate the FOZZ for the damage caused. The first applicant was further ordered to pay compensation to the State Treasury.

29. On 30 March 2005 Judge A.K., in view of the complexity of the case, requested the President of the Warsaw Regional Court to grant him an extension until 31 May 2005 for preparation of the written judgment. The request was granted. The judgment was served on the applicants' counsel on 5 May 2005. The operative part of the judgment runs to seventy pages and the reasoning to 830 pages.

30. The reasoning included a short presentation of evidence by certain witnesses concerning the alleged financing of political parties by the FOZZ.

It stated that the issue "had not been relevant for the determination of the case".

31. The reasoning further included a passage saying that "in the court's assessment, the FOZZ trial has not, however, shown the important role played by the [second applicant] in the functioning of the FOZZ...".

32. Subsequently, Judge A.K. requested that the Board of the Regional Court transfer him back to the 9th Appellate Division. On 17 May 2005 the Board granted that request in connection with "the termination of the FOZZ case in the 8th Criminal Division".

33. The Law of 3 June 2005 on amendments to the Criminal Code ("the 2005 Amendment"), which extended limitation periods, entered into force on 3 August 2005 (see paragraphs 108-117 below).

34. It appears from the case file that the second applicant moved to the United States of America on an unspecified date.

### 2. The applicants' appeals

35. The applicants lodged appeals with the Warsaw Court of Appeal. They alleged that Judge A.K. had been assigned to their case in breach of Articles 350 § 1 (1) and 351 § 1 of the Code of Criminal Procedure ("the CCP"). They argued that since the composition of the trial bench had been unlawful the appellate court should have quashed the lower court's judgment in its entirety. They further alleged that Judge A.K. had been involved in the passing of the 2005 Amendment, which amounted to a breach of their right to a fair trial by an impartial tribunal.

36. The second applicant alleged that Judge A.K. had lacked impartiality, referring to a statement made by him at the opening of the trial and certain passages in the reasoning showing that he had a negative attitude towards him. He also referred to statements made in an interview given by Judge A.K. to the weekly newspaper *Newsweek Polska* assuming the defendants' guilt and showing hostility towards the so-called "white collars", who in his view should have been severely punished.

37. The applicants also alleged that the trial court had violated the rules of criminal procedure and the rights of the defence in various respects.

### 3. Legal question to the Supreme Court

38. In the course of the appellate proceedings, the Warsaw Court of Appeal referred a legal question to the Supreme Court, seeking an interpretation of the provisions of the CCP concerning the assignment of a trial court judge to a given case and the consequences of an irregularly constituted trial bench for the outcome of appellate proceedings.

39. The legal question read as follows:

"Does the expression "court improperly constituted" in Article 439 § 1 (2) of the CCP also concern a situation in which a court that ruled on a case included a judge

who had been "allocated" to the case by some other entity than the [one] authorised to do so by law, i.e. the president of a court (president of a division) assigning a judge – Article 350 § 1 (1) of the CCP – in the manner specified in Article 351 § 1 of the CCP."

4. *The Supreme Court's Resolution of 17 November 2005 (no. I KZP 43/05)*

40. In a Resolution adopted on 17 November 2005, the Supreme Court replied as follows:

"The assignment of members of a court in breach of the rules specified in Articles 350 § 1 and 351 § 1 of the CCP constitutes a relative ground of appeal (*względna przyczyna odwoławcza*) referred to in Article 438 § 2 of the CCP."

41. In its legal question, the Court of Appeal noted that, in consequence of a decision adopted by the Board of the Warsaw Regional Court, the president of a division in that court had issued an order assigning Judge A.K. to hear case no. VIII K 37/98 pursuant to Article 350 § 1 (1) of the CCP. The same court also noted that the manner of assigning members of the court in that case had violated the rules specified in Article 351 § 1 of the CCP since Judge A.K. had not been on the list of judges from which a judge should have been selected, but had been "transferred" to the 8th Division of the Warsaw Regional Court in order to hear case no. VIII K 37/98.

42. The Supreme Court agreed with the Court of Appeal that the rules specified in Articles 350 § 1 and 351 § 1 of the CCP had been violated in the case. There had been a breach of Article 350 § 1 of the CCP, which consisted of a decision not entirely "independent" in nature being taken by the president of a division to select Judge A.K. to hear the case, since that decision had been predetermined by an earlier decision of the Board of the Regional Court. There had also been a violation of Article 351 § 1 of the CCP, which consisted of disregarding the list of judges of the division and assigning as a member of the court a judge who had been "transferred" from another division for that specific purpose, without indicating other valid reasons, as required by that provision.

43. The Supreme Court then examined whether the above-mentioned breach of the rules specified in Articles 350 § 1 and 351 § 1 could be regarded as the court being "improperly constituted" within the meaning of Article 439 § 1 (2) of the CCP. Pursuant to that provision, a finding that a court had not been properly constituted resulted in the judgment being automatically set aside on appeal. The Supreme Court noted that in previous cases the term had been applied in the following situations: where a court had been composed of a smaller or larger number of members than provided for by law; where lay judges had sat as members of a court instead of professional judges and vice versa; and where a member of a court had had no authority to examine a case in a given court.

44. The Supreme Court emphasised that a violation of the rules on the assignment of members of a court contained in Articles 350 and 351 of the CCP did not – in itself – result in a situation where a court had examined a case in a composition not provided for by law or where a member of a court had had no authority to decide in a given case. On the other hand, if a decision by a president of a court (president of a division) had, in breach of Article 351 § 1 of the CCP, resulted in a court with a composition unknown in the law for a given category of cases or a person not authorised to examine cases in a given court being selected, such a flaw would have to be regarded as an automatic ground of appeal within the meaning of Article 439 § 1 (2) of the CCP. However, in such a situation the procedural flaw would have to consist not only of a violation of Article 351 of the CCP, but also a violation of the provisions of the CCP concerning the composition of judicial benches and the competence of judges to examine cases in a given court. In such a situation, a violation of procedural rules would be of a qualified, double nature.

45. That had not occurred in the case under consideration, in which only Articles 350 § 1 and 351 § 1 of the CCP had been violated. In the Supreme Court's assessment, a sole violation of the above-mentioned provisions should be regarded as a relative ground of appeal. Consequently, in order to allow an appeal based on a relative ground, an appellate court had to establish, at least, a hypothetical link between the alleged procedural violation and the content of the judgment within the meaning of Article 438 § 2 of the CCP.

### 5.  The Court of Appeal's judgment (case no. II AKa 229/05)

46. The Warsaw Court of Appeal delivered its judgment on 25 January 2006.

47. It quashed the first applicant's conviction in respect of the offence of failure to perform her duties and of exceeding her authority (point IV of the operative provisions of the trial court's judgment). The reason given was that the offence had become subject to limitation on 17 July 2005, prior to the date of entry into force of the 2005 Amendment.

48. The Court of Appeal further quashed the second applicant's conviction in respect of theft of the FOZZ's property of a considerable value (point VI.2 of the operative provisions of the trial court's judgment). The principal reason given was the court's refusal to apply the 2005 Amendment to the relevant offence imputed to the second applicant. In consequence, the limitation period in respect of that offence had expired on 12 September 2005.

49. The Court of Appeal accordingly quashed the cumulative sentences imposed on the applicants. It discontinued the part of the proceedings concerning the quashed convictions. The Court of Appeal also lowered the fines imposed on the applicants.

50. The remainder of the trial court's judgment was upheld, including the first and second applicant's convictions for misappropriation of the FOZZ's property of a considerable value (points III and VI.1 respectively of the operative part of the trial court's judgment).

51. The Court of Appeal analysed the circumstances surrounding the assignment of Judge A.K. to the case. It found that the decision to assign him had simply been a consequence of the Board of the Regional Court's decision and not a sovereign act by the President of the 8th Division in the exercise of his powers under Article 350 § 1 (1) of the CCP. Having regard to the above, the Court of Appeal found that the statutory rules on the assignment of judges set out in Articles 350 § 1 (1) and 351 § 1 of the CCP had not been respected.

52. Having regard to the Supreme Court's Resolution of 17 November 2005, the Court of Appeal considered the effect of the breach of Articles 350 § 1 (1) and 351 § 1 of the CCP on the content of the trial court's judgment.

53. The Court of Appeal examined the circumstances concerning the enactment of the 2005 Amendment extending limitation periods, which was relevant for some of the charges against the applicants.

54. The bill had been introduced by a group of MPs from the opposition party, Law and Justice, on 21 February 2005, before the date of delivery of the trial court's judgment on 29 March 2005. The bill had made direct reference to the applicants' pending case.

55. The intentions of the drafters had been confirmed during debates in the Special Committee for Codification Amendments of the Sejm (the Lower House of Parliament) and at the plenary session of the Sejm. One of the supporters of the draft bill had been the member of parliament (MP) Z. Ziobro, who had also acted as rapporteur in the course of the parliamentary debate on the bill. Judge A.K. had been serving at that time as an advisor to the Special Committee on his recommendation.

56. The Court of Appeal observed that a judge could be appointed a member of the Minister of Justice's Criminal Law Codification Commission in accordance with the rules and procedures set out in the relevant Ordinance of the Council of Ministers. However, a judge was prevented from participating in parliamentary work on criminal law codification as an advisor chosen by an MP, parliamentary group or a political party. By doing so, a judge would in fact be acting as a lobbyist disclosing his political preferences. Such conduct was contrary to Article 178 § 3 of the Constitution and the provisions of the Organisation of the Courts Act.

57. The Court of Appeal noted that, according to a letter from the Chancellery of the Sejm (see paragraph 97 below), Judge A.K. had not been an advisor to the Special Committee in connection with the work on the bill extending limitation periods. However, the court's analysis of some

parliamentary records contradicted that assertion. It transpired from the minutes of a meeting of the Special Committee on 1 June 2005 that Judge A.K. had been present during a discussion on the bill. At that meeting Z. Ziobro MP, after the Committee had rejected his amendment to the bill, asked Judge A.K. "whether in this situation the FOZZ case would become time-barred". The Court of Appeal also referred to the minutes of the plenary session of the Sejm on 3 June 2005. At that session Z. Ziobro MP, replying to a question, stated that Judge A.K. had been permanent advisor to the Committee and presented verbatim the judge's position on an aspect of an amendment to the bill.

58. The Court of Appeal, having regard to the parliamentary records, established that Judge A.K. had actively sought to influence the amending legislation to the detriment of the defendants, even though at the same time he had examined their case at trial.

59. The Court of Appeal held as follows:

> "In the present case ... on the basis of the circumstances concerning the passing of the 2005 Amendment established in the course of the appellate proceedings, the Court of Appeal reached the conclusion that the regulations contained in the Act had been adopted by the legislature, in particular, so that they could be applied to the pending proceedings in a specific case indicated in the reasons for the bill, and in addition, the judge hearing the case took part in the process of amending the law as an advisor, thus showing a lack of impartiality. Having regard to the foregoing, the application of the 2005 Amendment to the present case would have patently violated the standards of Articles 10 and 45 § 1 of the Constitution and Article 6 of the Convention concerning the right to a fair trial before an impartial tribunal and would have had an obvious influence on the pertinent part of the judgment."

60. The Court of Appeal decided not to apply the 2005 Amendment to that part of the case. It therefore found that the limitation period in respect of the offence of theft of the FOZZ's property of a considerable value imputed to the second applicant had expired on 12 September 2005 (point VI.2 of the operative provisions of the trial court's judgment). It held that his conviction in respect of that offence had to be quashed and that the relevant part of the proceedings had to be discontinued.

61. Having regard to the foregoing, the Court of Appeal allowed the applicants' arguments concerning the flaws in the assignment of Judge A.K. to the case and the efforts of the judge to amend the legislation applicable to the case in the course of the trial and at the formal examination stage of the appeal. In the appellate court's view, the applicants had rightly pointed out that by accepting the role of advisor to the proponents of the bill amending the Criminal Code (extending limitation periods) Judge A.K. had shown a lack of impartiality. At the same time, Parliament, by failing to respect the rule of law, had encroached upon the competences of the judicial authorities and flouted the guarantees of a fair trial.

62. The Court of Appeal underlined that the above shortcomings had only affected part of the trial court's judgment, namely the offence imputed

to the second applicant (point VI.2 of the operative provisions of the trial court's judgment), for which the limitation period had been set to expire on 12 September 2005. Only in that part did there exist a logical and irrefutable causal link between the error in the assignment of Judge A.K. and his subsequent efforts to pass legislation amending the law to the detriment of the defendants in the case examined by him.

63. As to the remainder of the case, the Court of Appeal did not establish that the above shortcomings had influenced the content of the trial court's judgment. Accordingly, it did not accept the applicants' submissions, which were aimed at having the judgment of the trial court quashed in its entirety.

64. With regard to certain passages in the reasoning showing that Judge A.K. had a negative attitude towards the second applicant, the Court of Appeal found that many of them had been opinions based on fact and therefore could not be seen as showing a lack of impartiality towards the second applicant. However, the court agreed with the defence that the passage about the important role of the second applicant in the activities of the FOZZ had not been fact-based and was therefore inappropriate. Nonetheless, the statement was related to hypothetical behaviour of the second applicant which was unrelated to the charges against him and in any event had not influenced the content of the judgment. The second applicant had not substantiated either how the passage related to the financing of political parties by the FOZZ could show that Judge A.K. had had a negative attitude towards him, when that issue had not been examined by the trial court. With regard to the allegation raised by the second applicant of a lack of impartiality on the part of Judge A.K. in connection with his statement about the forty million victims in the case, the Court of Appeal found it to be groundless. It considered that the statement had to be seen in the proper context in which it was made, namely the trial court's determination to elucidate all the circumstances of the case.

65. The Court of Appeal dismissed the remainder of the applicants' appeals. It examined various allegations concerning the rights of the defence and the rules of criminal procedure raised by the applicants and rejected them all as unfounded or as having no bearing on the content of the judgment.

### 6. Cassation appeals

66. The Prosecutor General lodged a cassation appeal against the part of the Court of Appeal's judgment concerning the discontinuation of the proceedings against the second applicant in respect of the charge of theft of the FOZZ's property of a considerable value (point VI.2 of the operative provisions of the trial court's judgment). The Prosecutor General argued that the Court of Appeal had erred in holding that the application of the 2005 Amendment to the offence in question would have breached Articles 10 and 45 § 1 of the Constitution and Article 6 of the Convention

on account of the alleged lack of impartiality of Judge A.K. In his view, the appellate court's finding had resulted in the relevant part of the proceedings being unjustifiably discontinued.

67. The applicants also lodged cassation appeals. They challenged the Court of Appeal's finding that the uncontested breach of the rules concerning the assignment of Judge A.K. to their case could not have influenced the content of the trial court's judgment. In their view, the assignment of Judge A.K. in flagrant breach of Articles 350 § 1 and 351 § 1 of the CCP had resulted in their case not being examined by an impartial judge.

68. They further challenged the Court of Appeal's finding that the established lack of impartiality of Judge A.K. resulting from his active involvement in the passing of the 2005 Amendment could only be relevant for some of the offences imputed to them. In their view, his lack of impartiality had affected the whole trial and therefore the trial court's judgment should have been quashed in its entirety.

69. The second applicant also alleged that the Court of Appeal had not examined his arguments that Judge A.K. should have been removed from the case because of doubts as to his impartiality.

70. The applicants repeated their allegations concerning various violations of the rights of the defence and the rules of criminal procedure committed by the trial court, which had allegedly not been duly examined by the Court of Appeal.

### 7. The Supreme Court's judgment

71. On 21 February 2007 the Supreme Court gave judgment. It allowed the cassation appeal of the Prosecutor General and quashed the part of the Court of Appeal's judgment concerning the discontinuation of the proceedings against the second applicant, remitting that part of the case to it. It dismissed the cassation appeals filed by the applicants.

72. The Supreme Court examined the applicants' allegation that the assignment of Judge A.K. in flagrant breach of Articles 350 § 1 and 351 § 1 of the CCP had resulted in their case not being examined by an impartial judge. It confirmed that Judge A.K. had been assigned to the applicants' case in breach of the above provisions. However, having regard to its Resolution no. I KZP 43/05 of 17 November 2005, the Supreme Court noted that it was necessary to examine whether the above flaw had influenced the content of the trial court's judgment. For that to be the case the judge would have to be interested in the case having a specific outcome by violating the rules of criminal procedure.

73. In that connection, the Supreme Court first noted that behaviour which could raise doubts about the lack of impartiality of a judge hearing a case would have to arise up until delivery of the judgment by the judge in question. Secondly, it noted that the mere determination of the court in

striving to conclude the proceedings before the expiry of the limitation period was not indicative of its partiality. The lack of impartiality of a judge had to manifest itself in restrictions on the procedural rights of a party, improper gathering of evidence or the imposition of an unjust sentence. However, the applicants had not provided concrete examples of such shortcomings and had limited themselves to general allegations. They had merely referred to one statement made by Judge A.K. about "the forty million victims", the passage in the reasoning of the trial court related to the financing of political parties by the FOZZ and the antagonism of political parties with which Judge A.K. and the second applicant respectively sympathised.

74. With regard to the statement about "the forty million victims" the Supreme Court paid attention to the context in which it had been made – at the first trial hearing on 30 September 2002 in which Judge A.K., the president of the bench, had allowed journalists to disseminate images and information about the identities of the defendants (see paragraph 20 above). In the Supreme Court's view, an analysis of the statement did not permit the conclusion that Judge A.K. had identified himself with the victims in the case under examination by him. The statement had indicated that it was society that was entitled to have images of the defendants. For the Supreme Court, the statement was another unnecessarily pompous statement by Judge A.K. which was not in itself proof of his lack of impartiality. It also noted that the defence had not reacted to this statement by requesting that he be removed from the case. Likewise, before the start of the trial the defence had not raised the issue of any of the members of the trial bench possibly having a negative attitude towards the second applicant. With regard to the passage related to the financing of political parties by the FOZZ, the Supreme Court noted that it did not point to a lack of impartiality on the part of Judge A.K. The judge had concluded in the reasoning that that issue had been irrelevant for the determination of the case. Having regard to the foregoing, the Supreme Court did not share the applicants' views about the alleged lack of impartiality of the trial court.

75. The Supreme Court examined the applicants' arguments related to the alleged lack of impartiality of Judge A.K., which had allegedly ensued from his involvement in the passage of the 2005 Amendment. In that connection, the court noted that the bill had been introduced on 21 February 2005 and that only from that moment in time could one talk about his alleged involvement in the process. The bill had been introduced after the trial court had finished hearing evidence in the case (8 February 2005) and at a time when the trial had entered its final stages, with the closing statements by the parties. The court further noted that the parliamentary debate on the bill had effectively started in April 2005, after the trial court had delivered its judgment (29 March 2005). Accordingly, it could not be

said that the trial hearing had coincided with the parliamentary debate on the bill.

76. Furthermore, the 2005 Amendment had entered into force on 3 August 2005 and the limitation period with regard to one of the offences (point VI.2 of the operative part) had been set to expire on 12 September 2005. Accordingly, the consequences of the expiry of the limitation period and the entry into force of the law extending limitation periods had taken place in the course of the appellate proceedings.

77. The Supreme Court concluded that Judge A.K.'s involvement in the parliamentary debate on the bill had occurred after the trial had ended and thus could not have had any effect on the content of the judgment. It noted that the Court of Appeal must have embraced a similar view on that issue since it had not decided to quash the trial court's judgment in its entirety.

78. Having regard to the above conclusion, the court noted that the principal issue before the Court of Appeal and now before it was the compatibility of the 2005 Amendment with the Constitution and the Convention, as well as the related problem of how the court should proceed in the event of a finding of incompatibility.

79. With regard to the constitutionality of the 2005 Amendment, the Supreme Court referred to the established case-law of the Constitutional Court, which provided that limitation periods were not a subjective right (*prawo podmiotowe*) and therefore could be subject to change, including retrospectively. A change to a limitation period did not have a bearing on the criminalisation of a given act or the penalty that could be imposed. Rules on limitation periods did not provide guarantees for a person who committed an offence, but were established for the sake of punishment and were related to the State's criminal policy (referring to the Constitutional Court's judgment of 25 May 2004, case no. SK 44/03).

80. With regard to the constitutionality of the 2005 Amendment related to the shortcomings of the legislative process, the Supreme Court concurred with the Court of Appeal that the conduct of that process indicated that the impugned legislation had been adopted with a view to influencing the outcome of a particular case. The Court of Appeal had analysed the issue from the perspective of the "partiality" of Judge A.K., who had been involved in the preparation of the law partly determining the outcome of the case, but for the Supreme Court that issue had to been seen in a wider context. In fact, the Court of Appeal had analysed the issue of the "partiality of the legislature" and understood it to mean an encroachment by the legislature on the competences of the judicial authorities by the former's involvement in the determination of a specific case by means of enacting legislation.

81. The Supreme Court analysed whether "the partiality of the legislature" had occurred in the applicants' case. It had regard to the reasons

for the bill which, although very brief, had contained two paragraphs related to the FOZZ case.

82. The Supreme Court noted that the parliamentary debate on the bill, both in the relevant Committee meetings and at the plenary session of the Sejm clearly indicated the existence of links between the need to enact the impugned legislation and the proceedings in the applicants' case. A statement made by Z. Ziobro MP during the debate on the bill in the Sejm on 22 March 2005 was relevant here ("Among the thousands of cases [threatened by the expiry of the limitation period] there is also this one, which outrages and shocks Polish public opinion the most, which ... became the instigator and final argument for the introduction of this bill, and that is FOZZ-gate and the real risk of the limitation period expiring in this case"). Similarly, the statement made by J. Kaczyński MP in the same debate left no doubt as to the intentions of the proponents of the bill ("there is a legal possibility of influencing these proceedings").

83. In conclusion, the Supreme Court found that the involvement of the legislature, with the support of Judge A.K., could support the allegation that the object of the 2005 Amendment had been to influence the outcome of the applicants' specific case. Such a situation in turn raised doubts about its conformity with Articles 2 and 10 of the Constitution.

84. In the applicants' case, the Court of Appeal held that the 2005 Amendment was unconstitutional and for that reason, it independently decided not to apply it in the case. However, the Supreme Court found that in that respect the Court of Appeal had exceeded its competences. Instead of refusing to apply the unconstitutional legislation, it had been required to put a legal question to the Constitutional Court on the constitutionality of the 2005 Amendment. In the Supreme Court's view, the Constitutional Court had the exclusive competence to declare legislation unconstitutional.

85. For that reason, the Supreme Court quashed the part of the Court of Appeal's judgment concerning the discontinuation of the proceedings against the second applicant (point VI.2 of the operative provisions of the trial court's judgment) and remitted that part of the case to it.

### 8. Proceedings before the Constitutional Court

86. Following the Supreme Court's directions, on 31 August 2007 the Court of Appeal put a legal question to the Constitutional Court on the constitutionality of the 2005 Amendment.

87. The Court of Appeal submitted that "FOZZ-gate" had been mentioned throughout the parliamentary debate on the bill. It referred to the reasons for the bill and the statements made by the MPs, advisors and representatives of the Ministry of Justice in the course of debates of the Special Committee for Codification Amendments referring to the same case. In view of the above, the Court of Appeal considered that the 2005 Amendment had not been enacted as a general instrument of criminal

policy, but followed from the legislature's desire to influence the outcome of a particular case. Such a situation amounted to an encroachment by the legislature on the competences of the judicial authorities. For the Court of Appeal, there were substantiated doubts about the compatibility of the 2005 Amendment with Articles 2 (rule of law principle) and 10 (separation of powers) of the Constitution.

88. In its decision of 11 February 2009 (case no. P 39/07), the Constitutional Court discontinued the proceedings initiated by the legal question of the Court of Appeal on the grounds of *ne bis in idem*. It referred to an earlier judgment it had adopted on 15 October 2008 (case no. P 32/06), which was decisive for the case at issue. In that judgment the Constitutional Court held that the 2005 Amendment was compatible with the Constitution and Article 6 § 1 of the Convention (see paragraphs 118 and 125-126 below).

89. The Constitutional Court noted that the Court of Appeal had not questioned the very extension of the limitation period or the possibility of applying extended limitation periods to offences committed before the entry into force of the amending legislation which had not become time-barred under the rules formerly applicable. The allegations of the Court of Appeal had instead concentrated on shortcomings in the legislative process, but without invoking any of the relevant constitutional provisions regulating that process. The Court of Appeal had focused on the context and the circumstances surrounding the enactment of the impugned legislation by referring to select statements of the persons taking part in the parliamentary debate on the bill and mentioning certain passages from the reasons for the bill. However, that issue had already been addressed in the Constitutional Court's judgment of 15 October 2008 (see paragraphs 122-124 below). In that judgment, it had also underlined that the contested amendment had not influenced the judicial determination of the case.

### 9. *The Court of Appeal's second judgment*

90. On 1 June 2009 the Court of Appeal gave judgment.

91. It upheld the trial court's judgment with regard to the second applicant's conviction for theft of the FOZZ's property of a considerable value (point VI.2 of the operative provisions of the trial court's judgment). It only lowered the fine imposed on him in respect of that offence.

92. Having regard to the Constitutional Court's decision of 11 February 2009, the Court of Appeal ruled that it could not discontinue the criminal proceedings against the second applicant with regard to the above-mentioned offence on account of the expiry of the original limitation period as had been decided in its first judgment. It would not be acceptable to refuse to apply a law whose constitutionality had been confirmed by the Constitutional Court.

93. With regard to the allegations concerning the improper assignment of Judge A.K. to the case, the Court of Appeal, following the Supreme

Court's judgment, held that that shortcoming had not affected the content of the trial court's judgment. It dismissed further arguments raised by the second applicant in his appeal against the trial court's judgment.

### 10. The Supreme Court's second decision

94. The second applicant lodged a cassation appeal against the Court of Appeal's judgment. He alleged, in particular, that the Court of Appeal had violated the provisions of the substantive criminal law related to his conviction under Article 217 § 2 of the old Criminal Code. On 27 May 2010 the Supreme Court dismissed the second applicant's cassation appeal as manifestly ill-founded.

## C. Statements in the media

### 1. Article in Newsweek Polska

95. In issue no. 7 of 20 February 2005, *Newsweek Polska* published an article entitled "Polish Di Pietro" about the FOZZ trial, including an interview with Judge A.K. The relevant part reads as follows:

> "Journalists divide judges into those who have "pressure on the small screen" and those who consistently refuse to comment. Judge A.K. has a reputation as one of the best lawyers in Poland, but also as a "media stonewaller".. In the FOZZ trial he [has] a dual role: as a main judge and as a defender of what remains of the reputation of the administration of justice. The threat of the limitation period hangs over the indictment.
> ...

> "Journalist: Are you afraid that you will not have enough time to correct the prosecutors' mistakes and sentence [those who are] guilty?

> Judge A.K.: I will not comment on the trial. This is not a commission of inquiry.

> Q: Perhaps it does not resemble a meeting of a commission [of inquiry], but don't you have the impression that you are participating in the theatre of the absurd? The defendants faint, pretend to be mentally ill...

> A: I have. What's even worse [is that] I feel too frequently that it is not the defendant in the hands of a court, but me in the hands of the defendant and his counsel. Frequently, a team of people is working on how to use too liberal a law to block the trial. Unfortunately, we have succeeded in creating a belief among criminals that they can go unpunished.

> Q: Do you think that opportunity makes a thief?

> A: Not an opportunity, but the lack of an inevitable and adequate punishment. Up until recently a criminal could still laugh in our faces, because even if, by a miracle, he was caught and sentenced, he could use the stolen money with impunity, and even boast about it. ...

> Q: They still brag that they transferred money to their wives and that nothing can be done to them.

CHIM AND PRZYWIECZERSKI v. POLAND JUDGMENT          17

A: What we know about scandals is not even the tip of the iceberg. We already have [the] white-collar mafia. It is time to find efficient methods of detecting crimes and begin applying adequate punishments. ...

Q: Even if we catch criminals more efficiently, where would we lock them up?

A: We will stop spending money on implementing inefficient programmes, and build more prisons. Thanks to harsh punishments and a 'zero tolerance' [policy] even for minor crimes, it was possible to resolve the crisis in New York. Why shouldn't that idea work here?"

### 2. Interview with Z. Ziobro

96.  On 26 January 2006 Z. Ziobro, who had been appointed Minister of Justice in the meantime, gave an interview to a radio station. The transcript of the relevant part reads as follows:

"Q: Minister, your deputy, Judge [A.K.] has been criticised by the Court of Appeal's judges, who found that Judge [A.K.] had not been impartial in the case against Z. and [the first applicant].

A: The Court of Appeal's judges were either misled or have been seriously mistaken because they have relied on false information.

Q: Who could have misled them?

A: Perhaps the defence lawyers, who raised certain arguments, not always properly, but always in the interest of their clients. ... The facts are that, firstly, Judge [A.K.] was not an advisor to the Law and Justice [party], but an advisor to the Sejm's [Special Committee for Codification Amendments], as were many other judges, including judges of the Supreme Court. No one is alleging that because of that those judges are not impartial, and rightly so. Secondly, Judge [A.K.] did not take part in the debate on the provision extending limitation periods. I am the author of this provision, I conceived this provision and presented it to J. Kaczynski, and I then consulted two law professors, with whom I cooperate, who are also members of [advisors to] the Sejm's committees, Professors M. and L.T., I think that both of them would confirm this.

Q: But did you rely on Judge [A.K.]'s opinion in this case or not?

A: I could not have relied on Judge [A.K.]'s opinion in this case, because in this case Judge A.K. did not give an opinion. In this case Judge [A.K.] was not at all an initiator of this idea. I was the author.

Q: And you did not speak to him about this issue:

A: No, I did not speak to Judge [A.K.] about this issue. In this case, I acted as Z. Ziobro MP, who seeing what was happening in the FOZZ case, concluded that limitation periods should be extended. And not only in the FOZZ case, but also in other cases ..."

### D.  Note of the Chancellery of the Sejm on the participation of Judge A.K. in the work of the Committee

97.  An official note dated 21 July 2005 was submitted to the Warsaw Court of Appeal. It reads as follows:

"Judge A.K. was recommended by the deputy chairman of the Committee Z. Ziobro MP (PiS) to participate as an advisor in the work of the [Special Committee for Codification Amendments].

Because there is no custom in the Committee to appoint a permanent advisor, Judge A.K. was invited to many bills amending the criminal law on the instruction of Z. Ziobro MP.

It should be underlined that Judge A.K. was not the Committee's advisor in the legislative work on the deputies' bill amending the Criminal Code [extending limitation periods] (document no. 3785) at any stage of the work.

Judge A.K. was present at the [Committee's] meeting on 1 June 2005 on the point concerning the above-mentioned bill, because he was waiting for the beginning [of a discussion on] of the third point for which he had been invited as an advisor (i.e. on the bill amending the Criminal Code and the Code of Execution of Sentences in respect of combating paedophilia ...)

The agenda of that meeting included a discussion on the amendments proposed in the second reading of the deputies' bill:

I. amending the Criminal Code ([on] limitation periods – document no. 3785),

II. amending the Code of Criminal Procedure ...,

III. amending the Criminal Code and the Code of Execution of Sentences ([on] combating paedophilia ...).

Because the times for discussing particular points [of the agenda] were not been specified, Judge A.K. was present from the beginning of the meeting."

98. It appears that Judge A.K. participated as an advisor to the Special Committee on two bills amending the Criminal Code. One of those bills was introduced by the President of the Republic in December 2001 and the other by the then opposition party, Law and Justice, in March 2002. The Sejm has not concluded the debate on those bills.

## II. RELEVANT DOMESTIC LAW AND PRACTICE

### A. Constitution of the Republic of Poland

99. The relevant provisions of the Constitution read as follows:

#### Article 2

"The Republic of Poland shall be a democratic state ruled by law and implementing the principles of social justice."

### Article 42 § 1

"Only a person who has committed an act punishable by the law in force at the time of its commission shall be held criminally liable. This principle shall not preclude punishment for an act which, at the time of its commission, constituted an offence within the meaning of international law."

### Article 45 § 1

"Everyone shall have the right to a fair and public hearing of his case, without undue delay, before a competent, impartial and independent court."

## B. Code of Criminal Procedure

### 1. Request for the removal of a judge

100. Article 41 of the Code of Criminal Procedure ("CCP") provides:

"1. A judge shall be removed [from a case] if circumstances arise of such a nature which may give rise to justified doubts about his or her impartiality in a given case.

2. A request for the removal of a judge made under paragraph 1 after a trial has commenced shall not be examined, unless the grounds for removal only arose or became known to the party after the trial commenced."

### 2. Assignment of judges to cases

101. Article 350 § 1 of the CCP, in so far as relevant, reads:

"The President of a court shall issue a written order fixing a hearing, in which he indicates:

1) the judge or members of the [bench],

..."

102. At the material time, Article 351 § 1 provided as follows:

"A judge ... shall be assigned [to a case] in the order in which the case was filed and by reference to a list of judges of a given court or division, which is accessible to the parties. Departure from this rule is only permissible in the event of ... illness or for other valid reasons, which should be specified in the order fixing the hearing."

### 3. Grounds of appeal

103. Article 438 provides, in so far as relevant:

"A decision shall be set aside or amended in the event of a finding of:

1) ...,

2) a violation of procedural rules, if the violation could have had an influence on the content of a decision,

..."

104. Article 439, in so far as relevant, reads:

"1. The appellate court shall, regardless of the scope of the appeal and the grounds raised by the party and regardless of whether the procedural shortcoming has had any impact on the substance of a decision, set a decision aside if:

...

(2) the court was improperly constituted;"

### 4. *Reopening of criminal proceedings*

105. Article 540 § 3 of the Code of Criminal Procedure provides for the possibility of reopening the proceedings following a judgment of the European Court of Human Rights. It reads as follows:

"The proceedings shall be reopened for the benefit of the accused when such a need results from a decision (*rozstrzygnięcie*) of an international body acting on the basis of an international agreement ratified by the Republic of Poland."

## C. Criminal Code

106. Article 101 § 1 of the Criminal Code of 1997 set limitation periods for various categories of offences: (i) thirty years for crimes of homicide, (ii) twenty years for other crimes, (iii) ten years for misdemeanours punishable by a prison sentence exceeding three years, (iv) five years for offences punishable by a prison sentence not exceeding three years and (v) three years for offences punishable by a restriction of liberty or a fine.

107. Article 102 provided that limitation periods were to be extended by five years if a criminal investigation had been instituted against a suspect before the expiry of the limitation period as defined by Article 101 § 1.

## D. The 2005 Amendment to the Criminal Code

108. On 21 February 2005 a group of MPs from the Law and Justice party submitted a bill amending the Criminal Code to the Speaker of the Sejm (the Lower House of Parliament). The bill proposed to extend limitation periods.

109. The reasons for the bill read, in so far as relevant:

"The present amendment is a reply to a crisis of the Polish administration of justice. The expiry of the limitation period in respect of many offences, including the serious ones requires immediately a swift reaction of Parliament. The excessive length of proceedings certainly has many causes. Among them are some which are related to the inefficiency of the prosecution authorities and the administration of justice, and the weakness of the criminal law, as well as those resulting from intentional obstruction by the defendants and their lawyers aimed at evading the criminal responsibility.

The proposed change of the length of limitation period concerns exclusively those cases, in which sufficient evidence was gathered allowing charging a specific person with a commission of an offence. This change would mean that in such cases a limitation period prescribed in the criminal code would be extended not by five years

CHIM AND PRZYWIECZERSKI v. POLAND JUDGMENT                 21

as now, but by ten years. In consequence, this change gives all possibilities to conclude advanced criminal cases, where the expiry of a limitation period justly shocks the public opinion and entirely undermines the credibility of the administration of justice.

It should however also be underlined that in complex cases, in particular where there is a need to obtain evidence from abroad, the current limitation periods may be objectively too short to bring an end to the proceedings.

It should be underlined that the urgency of this matter is also justified by the need to save the so-called FOZZ scandal before there is a risk of the limitation period expiring. The [trial] court's efforts to give judgment could be thwarted at the final stages of the judicial proceedings as a result of the defendants and their lawyers using the imperfect provisions of the criminal procedure enabling them to [bring the trial to a standstill].

It would have certainly been a shame burdening everyone who did not support such a change if ... the biggest scandal of the Polish democracy, at the final stage of the judicial proceedings, had become time-barred ..."

110.  The first reading of the bill took place at the plenary session of the Sejm on 22 March 2005. The debate on the bill in the Special Committee for Codification Amendments took place on 12, 19 and 22 April 2005. Judge A.K. was not present during those meetings.

111.  The second reading at the plenary session took place on 18 May 2005.

112.  Subsequently, the debate on the bill in the Committee took place on 1 June 2005. The agenda for the Committee's meeting included a discussion on the bill extending limitation periods and two other bills. In the course of the discussion on the bill extending limitation periods, after the Committee had rejected his amendment, Z. Ziobro MP put a question to the Committee's advisor, Judge A.K. whether "in this situation the FOZZ case would become time-barred". The President of the Committee did not allow the question. Judge A.K. did not participate in the discussion on the bill. He briefly took part in a discussion concerning the second point on the agenda, namely a bill amending the Code of Criminal Procedure (concerning interviews of witnesses who were minors).

113.  The bill was enacted by the Sejm in the third reading on 3 June 2005.

114.  The Law of 3 June 2005 on amendments to the Criminal Code, extending limitation periods, entered into force on 3 August 2005 ("the 2005 Amendment").

115.  The 2005 Amendment modified Article 101 § 1 by adding subparagraph (2a), amending subparagraph (4) and repealing subparagraph (5). In accordance with subparagraph (2a) the limitation period for misdemeanours punishable by a prison sentence exceeding five years was set at fifteen years. Under subparagraph (4) the limitation period for all other misdemeanours was set at five years.

116. The 2005 Amendment also modified Article 102, which from then on provided that the limitation period for offences specified in Article 101 § 1 (1) to (3) was extended to ten years and for all other offences was set at five years.

117. Article 2 of the 2005 Amendment provided that the new limitation periods were to be applied to offences committed prior to the entry into force of the 2005 Amendment, except for the offences which had already become subject to limitation.

### E. The Constitutional Court's judgment on the 2005 Amendment (case no. P 32/06)

118. In its judgment of 15 October 2008, the Constitutional Court found that the provisions of the 2005 Amendment were compatible, *inter alia*, with Articles 2, 42 § 1 and 45 § 1 of the Constitution and Article 6 § 1 of the Convention.

119. The court noted that Article 42 § 1 of the Constitution (*nullum crimen, nulla poena sine lege*) did not regulate the issue of limitation periods, which was left to the legislature; however, the law regulating limitation periods had to be taken into account by the criminal courts. The law on limitation periods set the time-limits within which a criminal court could exercise its competence to classify a given act as an offence and impose the related penalty. The introduction of limitation periods was thus inextricably linked to the adjudication of an offence and the criminal sanction for its commission. The Constitutional Court held that the provisions of the 2005 Amendment, while extending limitation periods, did not change the grounds of criminal liability for specific acts carrying a penalty, but modified the temporal limits of that liability which had to be taken into account by the court examining the case.

120. With regard to Article 2 of the Constitution (the rule of law principle), the Constitutional Court reiterated that citizens had the right to enjoy the guarantees provided for in Article 42 § 1 of the Constitution. However, they could not expect to benefit from any particular criminal policy of the State, since depending on the nature of the threats linked to particular offences, that policy could be subject to modification. The Constitutional Court underlined that a defendant could not argue that the extension of a limitation period adversely affected his situation, since an offender could not foresee that a limitation period would be modified (referring to its judgment of 25 May 2004). It also noted that the change to a limitation period did not have an effect on the criminalisation of a given act or the penalty that could be imposed. Rules setting out limitation periods did not provide any guarantees for the perpetrator of an offence, but were established for the sake of punishment. The retroactive extension of a limitation period could be assessed in the light of the rule of law; however,

it was not related to a violation of vested rights or the protection of citizens' trust in the State in respect of criminal legislation.

121. The Constitutional Court held that the extension of limitation periods, pursuant to the 2005 Amendment, for offences in respect of which proceedings had been instituted against a specific individual, did not violate the principle of protecting citizens' trust in the State, within the meaning of Article 2 of the Constitution. The expectation of an offender that after the passage of a specific period of time, previously determined by the legislature, he would be no longer prosecuted could not be treated as a priority over the State's interests in the realisation of a criminal policy adapted to the changing reality.

122. With regard to Article 45 § 1 of the Constitution (the right to a fair hearing), the Constitutional Court observed that it was up to the legislature to decide if limitation periods should be introduced and in what form. It examined the argument that the 2005 Amendment had been enacted with a view to influencing the proceedings in the FOZZ case. It noted that the reasons for the bill indicated that FOZZ-gate had indeed been the inspiration for the amending legislation and criticised that fact. Legal norms should not be created for individual cases. However, it noted that the provisions of the 2005 Amendment were of a general and abstract nature and the reasons for the bill indicated that the proponents had wished to counteract certain negative phenomena.

123. At the same time, the Constitutional Court underlined that the reasons for the bill did not form part of statute, and might have only been used as an auxiliary tool in the functional interpretation of the law. The court noted that the content of the impugned norms of the 2005 Amendment could have been adequately established on the basis of textual interpretation. Therefore, the reasons for the bill had become redundant for the interpretation of the impugned norms and could only be assessed in political terms as appropriate or not appropriate.

124. The Constitutional Court noted nonetheless that the passage from the reasons for the bill (which contained phrases such as "it would have been a scandal") could be seen as an attempt at interference by the public authorities in the pending case concerning the FOZZ. On the other hand, it could not be presumed that the amending legislation would influence the conduct of the judicial proceedings and its outcome provided that the courts respected the law.

125. Lastly, the Constitutional Court examined the compatibility of the 2005 Amendment and, in particular the legislature's alleged intention to interfere with the pending proceedings in the applicants' case, with Article 6 § 1 of the Convention. In that connection, the court noted that its earlier findings concerning the compatibility of the 2005 Amendment with Article 45 of the Constitution also applied to the alleged incompatibility with Article 6 § 1 of the Convention. It pointed out that the case-law of the

Court regarding the essence and effects of extending limitation periods for prosecution was to a large extent consistent with the Constitutional Court's approach. It referred to the case of *Coëme and Others v. Belgium* (nos. 32492/96 and 4 others, ECHR 2000-VII).

126. The Constitutional Court found that, contrary to the case of *Zielinski and Pradal and Gonzalez and Others v. France* ([GC], nos. 24846/94 and 34165/96 to 34173/96, ECHR 1999-VII), the legislature's interference in the present case had not consisted of influencing the determination of the case on the merits (conviction or acquittal, imposition of a penalty, length of a penalty), but of making possible a judicial determination of the case on the merits. Therefore, it could not be said that the legislature's interference influenced the judicial determination of the case.

# THE LAW

## I. JOINDER OF THE APPLICATIONS

127. Given their similar factual and legal background, the Court decides that the two applications should be joined pursuant to Rule 42 § 1 of the Rules of Court.

## II. ALLEGED VIOLATION OF ARTICLE 6 § 1 OF THE CONVENTION AS REGARDS THE PRINCIPLE OF A "TRIBUNAL ESTABLISHED BY LAW"

128. The applicants complained under Article 6 § 1 of the Convention that Judge A.K. had been assigned to examine their case in the trial court in breach of Articles 350 § 1 and 351 § 1 of the Code of Criminal Procedure. They argued that this entailed a violation of their right to have their case examined by an independent and impartial tribunal and/or their right to a fair trial.

Article 6 § 1 reads, in so far as relevant:

"In the determination of ... any criminal charge against him, everyone is entitled to a fair ... hearing ... by an independent and impartial tribunal established by law."

129. The Court will examine the complaint that Judge A.K. was selected to hear the applicants' case in violation of the relevant provisions of domestic law under Article 6 § 1 of the Convention with regard to the requirement of a "tribunal established by law". The related complaint concerning the alleged lack of impartiality of Judge A.K. in connection with

his irregular assignment to the case will be examined separately below (see paragraphs 168-170 below).

## A. Admissibility

130. The Court notes that this complaint is not manifestly ill-founded within the meaning of Article 35 § 3 (a) of the Convention. It further notes that it is not inadmissible on any other grounds. It must therefore be declared admissible.

## B. Merits

### 1. The applicants' submissions

131. The first applicant argued that the trial court had not been "a tribunal established by law" as required under Article 6 § 1. In order to comply with that requirement, a bench had to be composed in accordance with the rules stipulated in Article 351 § 1 of the CCP. The Court of Appeal had stated in its legal question to the Supreme Court that the trial bench had been unlawfully composed.

132. The second applicant argued that the assignment of Judge A.K. to the case by an order of the President of the 8th Division based on a resolution of the Board of the Regional Court had undoubtedly violated Article 351 § 1 of the CCP. This had been acknowledged, *inter alia*, in the Supreme Court's Resolution of 17 November 2005 (no. I KZP 43/05). Judge A.K. had been assigned in an arbitrary manner to conduct only one, specific case. Notwithstanding the nature of the above breach in the light of Polish law, the assignment of Judge A.K. constituted a violation of Article 6 § 1 of the Convention because the court had been established contrary to the requirements of Article 351 § 1 of the CCP.

### 2. The Government's submissions

133. The Government maintained that the first-instance court which had dealt with the applicants' case was a "tribunal established by law" as required by Article 6 § 1. They submitted a number of arguments to the effect that the assignment of Judge A.K. to hear the applicants' case in the first-instance court had been made in compliance with the national law and had not been arbitrary.

134. They argued that Judge A.K., a Regional Court judge, had been authorised to hear the applicants' case. He had been assigned to the case pursuant to a decision of the Board of the Warsaw Regional Court. In the Government's view, the circumstances of the case had justified a departure from a standard rule on the assignment of cases specified in Article 351 § 1 of the CCP. They referred to the fact that the case had been very complex

and the case file voluminous. In these circumstances, it was evident that the case could not be assigned to the next judge on the list who had already been burdened with other cases, but had to be allocated to a judge who could begin to examine the case rapidly.

### 3. The Court's assessment

#### (a) Relevant principles

135. The Court reiterates that under Article 6 § 1 of the Convention a tribunal must always be "established by law". This expression reflects the principle of the rule of law, which is inherent in the system of protection established by the Convention and its Protocols (see, for example, *Jorgic v. Germany*, no. 74613/01, § 64, ECHR 2007-III).

136. "Law", within the meaning of Article 6 § 1, comprises, in particular, legislation on the establishment and competence of judicial organs (see, *inter alia*, *Lavents v. Latvia*, no. 58442/00, § 114, 28 November 2002).

137. The phrase "established by law" covers not only the legal basis for the very existence of a "tribunal", but also the composition of the bench in each case (see *Buscarini v. San Marino* (dec.), no. 31657/96, 4 May 2000; *Richert v. Poland*, no. 54809/07, § 43, 25 October 2011; and *Ezgeta v. Croatia*, no. 40562/12, § 38, 7 September 2017). The object of the term "established by law" in Article 6 of the Convention is to ensure that the judicial organisation in a democratic society does not depend on the discretion of the executive, but is regulated by law emanating from Parliament. In countries where the law is codified, organisation of the judicial system cannot be left to the discretion of the judicial authorities, although this does not mean that the courts do not have some latitude to interpret the relevant national legislation (see *Coëme and Others v. Belgium*, nos. 32492/96 and 4 others, § 98, ECHR 2000-VII; and *Gurov v. Moldova*, no. 36455/02, § 34, 11 July 2006).

#### (b) Application of those principles to the case

138. The Court notes that the issue of whether the assignment of Judge A.K. to hear the applicants' case in the first-instance court was in violation of the relevant provisions of the CCP was examined in detail in the Supreme Court's Resolution no. I KZP 43/05 of 17 November 2005. The Supreme Court found that the decision assigning Judge A.K. to the trial bench had been made in violation of Articles 350 § 1 and 351 § 1 of the CCP. At the same time, the court determined that the assignment of a judge to a bench of the first-instance court solely in violation of the above-mentioned provisions of the CCP was to be regarded as a relative ground of appeal within the meaning of Article 438 § 2 of the CCP, and not a ground automatically leading to the setting aside of a judgment (see paragraphs 40-45 above).

139. The Court considers that the Supreme Court's findings in the above-mentioned Resolution, subsequently confirmed by the Court of Appeal and the Supreme Court in the present case (see paragraphs 51 and 72 above), are dispositive of the issue that the composition of the first-instance court in the applicants' case did not comply with the applicable requirements of domestic law. The Government's arguments to the contrary cannot substitute the authoritative findings of the domestic courts on this point.

140. The Court further notes that the Court of Appeal and the Supreme Court examined whether a breach of Articles 350 § 1 and 351 § 1 of the CCP with regard to the assignment of Judge A.K. to the first-instance court had affected the content of the trial court's judgment. Having found that that had not been the case, the appellate courts dismissed the applicants' appeals on this point as unfounded. In consequence, the original defect in the assignment of Judge A.K. to the trial bench was not remedied.

141. Accordingly, the Court finds that the first-instance court which heard the applicants' case cannot be regarded as a "tribunal established by law".

142. Therefore, there has been a violation of Article 6 § 1 of the Convention.

## III. ALLEGED VIOLATION OF ARTICLE 6 § 1 OF THE CONVENTION ON ACCOUNT OF THE ALLEGED LACK OF IMPARTIALITY

143. The applicants complained under Article 6 § 1 of the Convention that Judge A.K. had not been impartial. They referred to his involvement in the passing of the 2005 Amendment, his statement at the opening of the trial and certain passages in the reasoning of the trial court's judgment. The applicants further pointed to his links with the Law and Justice party.

### A. Admissibility

144. The Court notes that this complaint is not manifestly ill-founded within the meaning of Article 35 § 3 (a) of the Convention. It further notes that it is not inadmissible on any other grounds. It must therefore be declared admissible.

### B. Merits

#### 1. The applicants' submissions

145. The first applicant argued that facts indicating a lack of impartiality occurring after a judgment was delivered had to be taken into account in assessing compliance with the requirement.

146. The second applicant maintained that the court adjudicating his case had not been independent and impartial. He argued that the manner in which Judge A.K. had been selected to conduct the case, contrary to the rules laid down in the CCP, raised legitimate doubts about his impartiality. In addition, immediately after giving judgment in the case, Judge A.K. had returned to his initial 10th Division of the Regional Court, which in his view emphasised the fact that he had actually only been assigned to the 8th Division to deal with his case.

147. Similar doubts concerned the participation of Judge A.K. as parliamentary advisor during the work on the 2005 Amendment. Between 2001 and 2002 he had been a member of a team in the Ministry of Justice that had presented in 2002 a very critical draft amendment to the Criminal Code, which had later been introduced as a civic bill and draft of the Law and Justice party. Due to his work on that team, Judge A.K. had been asked to become an advisor – in or around May 2002 – to the newly established Special Committee for Codification Amendments of the Sejm. He had accepted that invitation and in meetings had apparently solely defended the Law and Justice party's idea of severely punishing criminals. In that same period he had been adjudicating the second applicant's case.

148. The bill had been submitted to Parliament on 21 February 2005, whereas the trial court's verdict had been delivered on 29 March 2005. Therefore, Judge A.K. had taken part in the work on the bill which had been aimed at extending the limitation periods for the prosecution of offences covered by the indictment against the second applicant. His participation in the debate on the bill, whose rationale revealed a close association with the case which he had been adjudicating, raised legitimate doubts about his impartiality. It was of no significance that the work on the bill had continued, for the most part, after the verdict had been given, since that did not change the fact that it would have seemed impossible to introduce a bill on 21 February 2005 without having had prior discussions on it. That could mean nothing other than that Judge A.K. had been involved in the legislative process as an advisor before he had been selected as a member of the bench in the FOZZ case, already in 2001 to 2002. It was important that at the time of introduction of the bill, the verdict had not yet been given.

149. The second applicant further referred to issue no. 7/2005 of 20 February 2005 of *Newsweek Polska*, claiming that Judge A.K. had expressed his strong opinion of being in favour of punishing the so-called "white-collar mafia". The FOZZ trial had been regarded as a white-collar crime case and therefore the opinion of Judge A.K. expressed in the press had undermined his impartiality. Moreover, after delivering the verdict, Judge A.K. had stated in a press conference that "I don't have evidence, but Dariusz Przywieczerski was the mastermind behind the FOZZ scandal".

150. Following the parliamentary elections in September 2005 in which the Law and Justice party had gained power, Judge A.K. had been appointed

Deputy Minister of Justice in the new administration. In November 2009 the Minister, just before leaving office, had appointed Judge A.K. as a prosecutor of the State Prosecutor's Office, a lifetime post.

151. The activities of Judge A.K. after delivering the judgment could not be excluded from the assessment of his impartiality, since those later activities could bring to light and clarify his lack of impartiality in the course of the trial.

152. The principle of subjective impartiality had been violated not only because of the personal attitude of Judge A.K., as demonstrated by his statement about the forty million victims in the case and opinions voiced in *Newsweek Polska*, but also by the direct relationship between his opinions and advice for a new law that had been directly aimed at the trial which he had been presiding over at the same time reaching a politically preferred outcome.

153. In the course of the trial, the second applicant had unsuccessfully requested that Judge A.K. be withdrawn from the case. He had also objected to his partiality in the course of the appellate proceedings.

### 2. *The Government's submissions*

154. According to the Government, Judge A.K. had been impartial, as required by Article 6 § 1 of the Convention. They maintained that there had been no time overlapping between the trial and the schedule of the debate on the bill extending limitation periods in the Sejm. The bill had been introduced on 21 February 2005, after the trial court had finished hearing evidence on 8 February 2005. The parliamentary debate on the bill had taken place almost entirely after the trial court had delivered its judgment (29 March 2005). Hence, the participation of Judge A.K. in the legislative debate on the bill could not have had any influence on the determination of the case. His participation in the legislative work had been recorded at the very end of that process, as late as on 1 June 2005, but he had not discussed the bill in question.

155. The Government submitted that pursuant to section 42(1) of the Rules of Procedure of the Sejm, in reviewing bills committees of the Sejm could hear opinions expressed by invited advisors, who could also participate in the meetings of a Committee. The applicable law did not prevent a judge from participating in the legislative debate as an advisor, provided that he demonstrated impartiality in line with Article 178 § 3 of the Constitution. An analysis of the minutes of the meetings of the Special Committee held in April and June 2005 did not support the allegation that those rules had been violated. The Government argued that the parliamentary debate on the bill had not influenced the court proceedings or the impartiality of Judge A.K.

156. In the Government's view, the lack of impartiality of a judge hearing a case would have to arise up until delivery of the judgment by the

same judge. The activities of the judge after the judgment's delivery could not be examined in terms of partiality. If there had been doubts about the impartiality of the judge, the applicants should have asked for him to be removed from the case under Article 41 § 1 of the CCP.

157. The Government argued that Judge A.K. had not demonstrated any partiality, either subjectively or objectively; in particular, he had not been interested in bringing the trial to a desired conclusion by violating the rules of criminal procedure. The applicants could not prove otherwise in their appeals. In the Government's view, the judge's determination to conclude the proceedings before the relevant offence had become time-barred could not be considered indicative of his partiality. The applicants could not prove that Judge A.K. had showed any prejudice or bias. The domestic courts had examined the case on appeal and in cassation and had found no signs of partiality.

158. The Government submitted that Judge A.K., in sentencing the applicants, had taken into account the mitigating circumstances. They referred to a passage from the reasoning of the trial court's judgment that the defendants had been "pilloried by accusations presented by the prosecutors and public opinion" which had affected "their quality of life".

### 3. The Court's assessment

#### (a) General principles

159. The relevant Convention principles are summarised in the case of *Morice v. France* [GC] (no. 29369/10, §§ 73-78, ECHR 2015, with further references), as follows:

"73. The Court reiterates that impartiality normally denotes the absence of prejudice or bias, and its existence or otherwise can be tested in various ways. According to the Court's settled case-law, the existence of impartiality for the purposes of Article 6 § 1 must be determined according to a subjective test where regard must be had to the personal conviction and behaviour of a particular judge, that is, whether the judge held any personal prejudice or bias in a given case; and also according to an objective test, that is to say by ascertaining whether the tribunal itself and, among other aspects, its composition, offered sufficient guarantees to exclude any legitimate doubt in respect of its impartiality...

74. As to the subjective test, the principle that a tribunal must be presumed to be free of personal prejudice or partiality is long-established in the case-law of the Court ... The personal impartiality of a judge must be presumed until there is proof to the contrary ... As regards the type of proof required, the Court has, for example, sought to ascertain whether a judge has displayed hostility or ill will for personal reasons...

75. In the vast majority of cases raising impartiality issues the Court has focused on the objective test ... However, there is no watertight division between subjective and objective impartiality since the conduct of a judge may not only prompt objectively held misgivings as to impartiality from the point of view of the external observer (objective test) but may also go to the issue of his or her personal conviction (subjective test)... Thus, in some cases where it may be difficult to procure evidence

with which to rebut the presumption of the judge's subjective impartiality, the requirement of objective impartiality provides a further important guarantee ...

76. As to the objective test, it must be determined whether, quite apart from the judge's conduct, there are ascertainable facts which may raise doubts as to his or her impartiality. This implies that, in deciding whether in a given case there is a legitimate reason to fear that a particular judge or a body sitting as a bench lacks impartiality, the standpoint of the person concerned is important but not decisive. What is decisive is whether this fear can be held to be objectively justified...

77. The objective test mostly concerns hierarchical or other links between the judge and other protagonists in the proceedings ... It must therefore be decided in each individual case whether the relationship in question is of such a nature and degree as to indicate a lack of impartiality on the part of the tribunal ...

78. In this connection even appearances may be of a certain importance or, in other words, "justice must not only be done, it must also be seen to be done"... What is at stake is the confidence which the courts in a democratic society must inspire in the public. Thus, any judge in respect of whom there is a legitimate reason to fear a lack of impartiality must withdraw..."

**(b) Application of those principles in the present case**

160. The Court notes that, according to the second applicant, he had requested that Judge A.K. be withdrawn from the case in the course of the trial. However, there is no evidence in the case file that that request was actually made. In any event, the applicants raised the issue of the alleged lack of impartiality of Judge A.K. in their successive appeals to the Court of Appeal and the Supreme Court (see paragraphs 35-36 and 67-69 above).

*(i) Subjective test*

161. With regard to the subjective test, the Court will scrutinise Judge A.K.'s statement made at the opening of the trial and the passages of the reasoning complained about by the applicants, as well as the statements made in his *Newsweek Polska* interview.

162. Firstly, the applicants took issue with the statement made by Judge A.K. at the opening of the trial about the "forty million victims" in the case (see paragraph 20 above). The domestic courts, having analysed extensively the statement in the context in which it was made, found that it did not indicate a lack of impartiality (see paragraphs 64 and 74 above). Secondly, the applicants objected to certain passages in the trial court's reasoning. One such passage concerned the issue of the alleged financing of political parties by the FOZZ (see paragraph 30 above). The other passage was related to the important but unknown role played by the second applicant in the functioning of the FOZZ (see paragraph 31 above). With regard to the first passage, the trial court itself held that the issue was irrelevant for the determination of the case. The Court of Appeal found that the second applicant had not substantiated how that passage, recounting the evidence of some witnesses, could show that Judge A.K had had a negative attitude

towards him. With regard to the second passage, the Court of Appeal criticised the trial court for characterising the second applicant's role as such without factual grounds for doing so. However, it noted that the assertion concerned hypothetical behaviour of the second applicant and was unrelated to the charges against him. Having analysed the statements complained about by the applicants in the context in which they were made, the Court finds that they could not be considered indicative of Judge A.K.'s personal prejudice or bias.

163. As regards the second applicant's assertions regarding the interview given by Judge A.K., the Court notes that it was published in a national weekly on 20 February 2005. This was at the final stage of the trial, since the trial court had finished hearing evidence on 8 February 2005, but before the judgment was delivered on 29 March 2005. The Court reiterates that the judicial authorities are required to exercise maximum discretion with regard to the cases with which they deal in order to preserve their image as impartial judges. That discretion should dissuade them from making use of the press, even when provoked. It is the higher demands of justice and the elevated nature of judicial office which impose that duty (see *Buscemi v. Italy*, no. 29569/95, § 67, ECHR 1999-VI, and *Olujić v. Croatia*, no. 22330/05, § 59, 5 February 2009).

164. The Court notes that in the interview in question Judge A.K. refused to comment on the trial. When pressed by the journalist, he stated that "Unfortunately, we have succeeded in creating a belief among criminals that they [can] go unpunished." He further expressed himself as being in favour of the policy of imposing harsh punishments on criminals (see paragraph 95 above).

165. The Court considers that it would have been preferable for Judge A.K. to have refrained from expressing his views in the media entirely, in order to avoid any possible misgivings about his impartiality. Nonetheless, having examined the specific language used by him in the interview, the Court finds that he did not make any pronouncement on the question of the applicants' guilt or otherwise imply that he had formed an unfavourable view of the applicants' case prior to delivering a verdict (see, *a contrario*, *Buscemi*; and *Lavents*, § 119, both cited above). Furthermore, it cannot be inferred from his comments in favour of a harsh criminal policy that he considered the applicants guilty.

166. In conclusion, the Court finds that the applicants have not established that Judge A.K. displayed personal bias against them.

167. The second applicant also alleged that at a press conference following the delivery of the verdict Judge A.K. referred to him as the "mastermind behind the FOZZ scandal". However, he produced no evidence that that statement had actually been made.

*(ii) Objective test*

168. With regard to the objective test, the applicants firstly alleged that the lack of impartiality of Judge A.K. had ensued from his assignment to hear the applicants' case in violation of Articles 350 § 1 and 351 § 1 of the CCP (see paragraphs 35 and 67 above). The Court has already found that the contested assignment of Judge A.K. amounted to a violation of Article 6 § 1 of the Convention as regards the principle of a "tribunal established by law" (see paragraphs 138-142 above).

169. The Supreme Court examined the applicants' plea that the irregular assignment of Judge A.K. had resulted in their case not being examined by an impartial judge. Having regard to its earlier Resolution no. I KZP 43/05, the court held that there was no automatic correlation between the specific flaw in the assignment of Judge A.K. and his alleged lack of impartiality. It noted that the flaw had not resulted in a trial bench with a composition unknown in the law or a judge being assigned who had not been authorised to hear a case in a regional court. The Supreme Court further noted that the lack of impartiality of a judge would have to manifest itself in restrictions on the procedural rights of a party, improper gathering of evidence or the imposition an unjust sentence. However, the applicants did not succeed in demonstrating any such shortcomings in their case (see paragraphs 72-74 above). The Court finds that the applicants' argument was examined thoroughly by the Supreme Court and discerns nothing arbitrary in that court's findings.

Furthermore, there is no indication that Judge A.K. arranged to have the applicants' case assigned to him for personal reasons (*De Cubber v. Belgium*, 26 October 1984, § 25, Series A no. 86; and, *a contrario, DMD GROUP, a.s., v. Slovakia*, no. 19334/03, §§ 69-71, 5 October 2010). In fact, he initially refused to accept the proposal to assign the case to him (see paragraph 16 above).

170. Against this background, the Court finds that the applicant's fears of a lack of impartiality on account of Judge A.K.'s irregular assignment to the case were not objectively justified.

171. The second issue under the objective impartiality test concerns the alleged involvement of Judge A.K. in the enactment of the 2005 Amendment, despite his adjudicating the applicants' case. According to the applicants, the judge's participation, as an advisor, in the work of the Sejm's Committee on the bill extending limitation periods, raises doubts about his impartiality.

172. The Court notes that in the Court of Appeal's view Judge A.K. had actively sought to influence the amending legislation (see paragraph 58 above). However, the Supreme Court overruled that finding. It established that the involvement of Judge A.K. could have been possible at the earliest from the date of introduction of the bill (21 February 2005), when the trial had entered its final stages, with the closing statements by the parties.

Furthermore, having regard to the dates of the debate on the bill in the Committee, the Supreme Court excluded the possibility that the parliamentary debate had overlapped with the trial hearing (see paragraph 75 above).

173. The Court has analysed the minutes of the Committee's meetings on the bill. It notes that Judge A.K. was absent from them and that on the one occasion when he was present, at a meeting held on 1 June 2005, he did not discuss the bill at issue (see paragraphs 57 and 112 above). At that meeting Z. Ziobro MP asked to hear comments from him on a proposed amendment to the bill, but that was not allowed by the Committee's President. The Court also takes note of the official note prepared by the Sejm's Chancellery attesting that Judge A.K. had not served as the Committee's advisor during the debate on the bill at issue (see paragraph 97 above).

174. It should also be noted that the 2005 Amendment entered into force on 3 August 2005, after the trial court's verdict had been given and that the legislation could only have been relevant for the appellate stage of the proceedings. It follows that Judge A.K. could not have applied the 2005 Amendment to the applicants' case. Even assuming that he participated in the parliamentary debate in an advisory capacity – which, in any event, has not been established – he did not carry out both advisory and judicial functions in the same case. This distinguishes the applicants' case from cases where the consecutive exercise of legislative or advisory and subsequently of judicial functions cast doubts on the impartiality of a given body or a member of that body (see *Procola v. Luxembourg*, 28 September 1995, § 45, Series A no. 326; *McGonnell v. the United Kingdom*, no. 28488/95, §§ 55-58, ECHR 2000-II; and *Kleyn and Others v. the Netherlands* [GC], nos. 39343/98 and 3 others, §§ 196-201, ECHR 2003-VI). The situation obtaining in the applicants' case was somewhat similar to the case of *Pabla Ky v. Finland* (no. 47221/99, ECHR 2004-V), where a member of the Court of Appeal, who was also a member of parliament, had not exercised any prior legislative, executive or advisory functions in respect of the subject matter or legal issues decided by the Court of Appeal. The Court held in that case that the fears of a lack of impartiality had not been objectively justified (ibid., § 34).

175. The applicants alleged that Judge A.K. must have advised the opposition deputies in the drafting of the bill extending limitation periods. However, they have presented no evidence for that assertion. It appears that Judge A.K. was recommended as an advisor to the Committee by Z. Ziobro MP of the Law and Justice party (see paragraph 97 above) and participated in that capacity in the Committee's debate on certain bills amending criminal legislation, in particular two bills amending the Criminal Code (see paragraph 98 above). However, there is no indication that he was involved in the drafting of the bill at issue.

176. The applicants also alleged that Judge A.K. had political links with the Law and Justice party. They referred, *inter alia*, to his appointment as Deputy Minister of Justice in September 2005, following the parliamentary elections won by the Law and Justice party. However, they have not substantiated that those alleged political links were of any relevance for the issue of whether he lacked objective impartiality in relation to their trial, which ended on 29 March 2005.

177. Having regard to the foregoing, the Court finds that in the circumstances of the present case, the applicants' fears related to the alleged involvement of Judge A.K. in the passage of the 2005 Amendment cannot be regarded as objectively justified.

178. The Court therefore concludes that there has been no violation of Article 6 § 1 of the Convention on account of the alleged lack of impartiality of Judge A.K.

## IV. ALLEGED VIOLATION OF ARTICLE 6 § 1 OF THE CONVENTION ON ACCOUNT OF THE ALLEGED LEGISLATIVE INTERFERENCE IN THE CRIMINAL PROCEEDINGS

179. The applicants complained that their right to a fair hearing had been violated because of the enactment of the 2005 Amendment extending limitation periods in the course of their criminal case. They also alleged that the 2005 Amendment had been motivated by the FOZZ case, referring to the reasons for the bill. They relied on Article 6 § 1 of the Convention.

### A. Admissibility

#### 1. As regards the first applicant

180. The Government raised an objection concerning the first applicant's victim status. They argued that the 2005 Amendment extending limitation periods had had no effect on the limitation periods for the offences of which she had been convicted. Secondly, they maintained that the first applicant's case had to be declared inadmissible on account of an abuse of the right of individual application.

181. The first applicant did not comment.

182. The Court reiterates that, in order to claim to be a victim of a violation, a person must be directly affected by the impugned measure (see *Burden v. the United Kingdom* [GC], no. 13378/05, § 33, ECHR 2008, with further references); in this case, the extension of the limitation periods pursuant to the 2005 Amendment.

183. The Court notes that the trial convicted the first applicant of two offences: (i) misappropriation of the FOZZ's property of a considerable value and (ii) failure to perform her duties to the detriment of the FOZZ and

of exceeding her authority. The limitation periods in respect of those offences, calculated in accordance with the version of the Criminal Code applicable before the entry into force of the 2005 Amendment, were due to expire on 9 December 2006 and 17 July 2005 respectively. In its judgment of 25 January 2006, the Court of Appeal quashed the first applicant's conviction for failure to perform her duties and of exceeding her authority and discontinued that part of the proceedings on the grounds that the offence had become subject to limitation on 17 July 2005. The 2005 Amendment was not applied to the offence because it entered into force on 3 August 2005. Furthermore, the Court of Appeal upheld the first applicant's conviction for misappropriation of the FOZZ's property of a considerable value. The Court of Appeal's judgment became final in respect of the offences of which the applicant was convicted. The Court notes, therefore, that the 2005 Amendment extending limitation periods was not applied to the first applicant and she was not affected by this measure.

184. It follows that the first applicant cannot claim to be the victim of a violation of Article 6 § 1 with regard to the application of the 2005 Amendment to the case against her. Accordingly, her complaint is incompatible *ratione personae* with the provisions of the Convention within the meaning of Article 35 § 3 (a) and must be rejected in accordance with Article 35 § 4.

185. It is therefore unnecessary to examine the Government's second preliminary objection concerning the alleged abuse of the right of individual application.

### 2. As regards the second applicant

186. The Government requested the Court to declare the complaint of the second applicant inadmissible on the grounds of an abuse of the right of application in accordance with Article 35 §§ 3 (a) and 4 of the Convention. They submitted that an individual could not argue that the extension of a limitation period, where the relevant offence had never become subject to limitation, had detrimentally affected his situation since an offender could not foresee that a limitation period would be modified. An application based on a calculation to avoid criminal liability resting solely on the possibility that an offence would become time-barred should be considered as an abuse as it attempted to draw benefits from the Convention against the principles of social justice.

187. The second applicant argued that the Government had erroneously interpreted Article 35 § 3 (a) of the Convention. The concept of "abuse" within the meaning of that provision had to be understood as the harmful exercise of a right for purposes other than those for which it was designed. His complaint did not constitute in any way an "abuse" in the sense attributed to it in the Court's case-law. In the present case, the second applicant complained that he had not had a fair hearing, having regard to,

*inter alia*, the extension of limitation periods as a consequence of the enactment of the 2005 Amendment in the course of his criminal case.

188.  The Court reiterates that under Article 35 § 3(a) of the Convention an application may be rejected as an abuse of the right of individual application if, among other reasons, it was knowingly based on untrue facts (see, among many other authorities, *Gross v. Switzerland* [GC], no. 67810/10, § 28, ECHR 2014 with further references). Secondly, it may also be rejected in cases where an applicant had used particularly vexatious, contemptuous, threatening or provocative expressions in his communication with the Court (see, for example, *Řehák v. the Czech Republic* (dec.), no. 67208/01, 18 May 2004).

189.  However, the notion of abuse of the right of application under Article 35 § 3 (a) of the Convention is not limited to those two instances and other situations may also be considered as an abuse of that right. In principle, any conduct on the part of an applicant that is manifestly contrary to the purpose of the right of individual application as provided for in the Convention and which impedes the proper functioning of the Court or the proper conduct of the proceedings before it can be considered as an abuse of the right of application (see *Miroļubovs and Others v. Latvia*, no. 798/05, § 65, 15 September 2009).

190.  Having regard to its case-law on the issue, the Court finds that the arguments raised by the Government with regard to the second applicant's conduct cannot be regarded as an abuse of the right of application within the meaning of Article 35 § 3 (a) of the Convention. It accordingly dismisses the Government's preliminary objection.

191.  The Court notes that the second applicant's complaint is not manifestly ill-founded within the meaning of Article 35 § 3 (a) of the Convention. It further notes that it is not inadmissible on any other grounds. It must therefore be declared admissible.

## B. Merits

### 1. The second applicant's submissions

192.  The second applicant submitted that the 2005 Amendment had extended limitation periods in respect of acts committed prior to its enactment. In his view, this was contrary to the principle of mandatory application of a more favourable law defined in Article 4 § 1 of the Criminal Code. The term "more favourable law" referred to in that provision had to be understood as the entire body of criminal law, including provisions on limitation periods.

193.  Furthermore, the 2005 Amendment was known to the public as the so-called "FOZZ law". That pointed to a close association between the enactment of the 2005 Amendment and the effect to be achieved with regard

to the proceedings in which the second applicant had eventually been convicted. The second applicant did not agree with the assertion that certain political statements which had been made in connection with the bill did not represent the intentions of the legislature. In his view, those statements had brought the legislature's intentions to light. In most democratic societies, such statements were often used by the courts to clarify the legislature's intentions. Having regard to those statements and the fact that the 2005 Amendment was commonly referred to as the FOZZ Act, the second applicant argued that the legislature's purpose had been to prevent the expiry of the limitation periods in his case. This constituted external pressure from the legislative branch with regard to the adjudication of his case, in violation of Article 6 § 1.

194. The applicant maintained that because of a close association between the enactment of the 2005 Amendment and the criminal case against him, no comparison could be made with the case of *Coëme and Others v. Belgium*. Furthermore, the Court's findings in that judgment with regard to the extension of limitation periods were only relevant in respect of Article 7 of the Convention and not with respect to the assessment of a complaint under Article 6 § 1 of the Convention.

### 2. *The Government's submissions*

195. The Government submitted that the second applicant had had a fair hearing in the determination of the criminal charges against him. Having regard to the Court's case-law, they argued that the right to a fair hearing did not entail a prohibition on extending limitation periods in respect of offences which had never become time-barred. In respect of such offences, the extension of limitation periods through the immediate application of procedural law was legitimate under Article 6 § 1 of the Convention.

196. The Government referred to the relevant findings of the domestic courts on that issue and maintained that the legislature's intentions were not to be derived from the statement made by the participants in the legislative debate on the bill, but first and foremost from the content of the normative act.

197. The Constitutional Court had analysed in its judgment the argument that the 2005 Amendment had constituted a direct intervention by the authorities in the applicants' case. It had noted that a passage from the reasons for the bill could be read as an attempt at interference. However, it could not have been presumed that the 2005 Amendment would influence the outcome of the proceedings provided that the courts respected the law. Furthermore, the reasons for the bill had been redundant for the interpretation of the 2005 Amendment.

198. The Government submitted that the 2005 Amendment had been the first amendment to the 1997 Criminal Code with regard to the statute of limitations. Having regard to the passage of time since 1997 and the number

of criminal cases barred by the statute of limitations, the legislature had had
grounds to conclude that there had been a need to correct the State's policy
in this regard.

### 3. The Court's assessment

199. The Court will examine the complaint under Article 6 § 1 that the
criminal proceedings were unfair as a result of legislative intervention only
with regard to the second applicant, since it has declared the same complaint
of the first applicant incompatible *ratione personae* (see paragraph 184
above). It notes that the 2005 Amendment was applied in the criminal
proceedings against the second applicant with regard to the offence of theft
of the FOZZ's property of a considerable value.

200. The Court first notes that under Article 2 of the 2005 Amendment,
the extended limitation periods were to be applied to offences committed
prior to entry into force of the Act, except for offences which had already
become subject to limitation. The provision therefore contained a guarantee
that no prosecution was possible in respect of offences that had become
time-barred in accordance with the rules applicable prior to the entry into
force of the 2005 Amendment.

201. The Court further observes that the question of compatibility of the
2005 Amendment with the Constitution and Article 6 § 1 of the Convention
in the context of the second applicant's case was examined by the domestic
courts. The leading decision on that issue was the Constitutional Court's
judgment of 15 October 2008 (no. P 32/06). In its later decision of
11 February 2009 (case no. P 39/07) regarding the second applicant's case,
it relied on the findings made by it in the earlier judgment.

202. In its leading judgment, the Constitutional Court held that the
provisions of the 2005 Amendment were compatible with the Constitution.
It established that the Act had extended the time-limits for prosecution, but
had not altered the basis for criminal liability for specific acts or the
penalties applicable to them. It also found that the Constitution did not
protect an offender's expectation that the rules on limitation periods would
not be modified to his detriment.

203. The second applicant also complained that the 2005 had been
motivated by the FOZZ case. The Court notes the critical remarks expressed
by the Constitutional Court in its leading judgment in respect of the reasons
for the bill referring to the FOZZ case. At the same time, the Constitutional
Court noted that the proponents of the bill had wished to address the more
general issue of the expiry of limitation periods. The same court found that
the reasons for the bill did not form part of the law and were irrelevant for
the interpretation of the norms contained in the 2005 Amendment.

204. The second applicant further alleged that the 2005 Amendment had
been enacted to influence the proceedings in his case. The Court notes that
the Constitutional Court examined the issue of the alleged legislative

interference in the second applicant's case and its compatibility with Article 6 § 1 of the Convention. It found that the effect of the 2005 Amendment had been to make possible a judicial determination of the case against the second applicant. On the other hand, the Act had had no impact on the substantive determination of the case since it had not modified the basis for criminal liability for the offences imputed to the second applicant or the penalties applicable to them (see paragraphs 119-120 and 126 above). The Court subscribes to the findings of the Constitutional Court. It finds that the 2005 Amendment cannot be regarded as the legislative interference in the second applicant's case since – in accordance with the Constitutional Court's findings – that law did not influence the judicial determination of the case in the substantive sense, but merely extended the temporal limits of criminal liability (compare and contrast *Stran Greek Refineries and Stratis Andreadis v. Greece*, 9 December 1994, § 49, Series A no. 301-B, and *Zielinski and Pradal and Gonzalez and Others v. France* [GC], nos. 24846/94 and 34165/96 to 34173/96, § 57, ECHR 1999-VII; civil cases in which the Court held that the principle of the rule of law and the notion of fair trial enshrined in Article 6 precluded any interference by the legislature – other than on compelling grounds of the general interest – with the administration of justice designed to influence the judicial determination of the dispute).

205. In this connection, the Court reiterates that in *Coëme and Others v. Belgium*, it examined a complaint under Article 7 of the Convention about the immediate application of a law extending limitation periods. It found that the provision had not been violated "since it could not be interpreted as prohibiting an extension of limitation periods through the immediate application of a procedural law where the relevant offences have never become subject to limitation" (§ 149). In the judgment, the Court classified the rules on limitation periods as procedural laws. It later confirmed that it was reasonable for domestic courts to apply the *tempus regit actum* principle with regard to procedural laws (see *Scoppola v. Italy (no. 2)* [GC], no. 10249/03, § 110, 17 September 2009). The rules on limitation periods did not define the offences or corresponding penalties and could be construed as merely laying down a prior condition for the examination of a case (see *Previti v. Italy* (dec.) no. 1845/08). In that sense, the rules on limitation periods had no bearing on the exercise of the right to a fair hearing.

206. Having regard to those findings, which may be respectively applied to the second applicant's complaint under Article 6 § 1, and in the absence of arbitrariness, the Court finds that the application of the 2005 Amendment extending limitation periods to the case against the second applicant cannot be interpreted as a violation of the right to a fair hearing.

207. Having regard to the foregoing, the Court finds that there has been no violation of Article 6 § 1 of the Convention on account of the alleged

legislative interference in the criminal proceedings in respect of the second applicant.

## V. APPLICATION OF ARTICLE 41 OF THE CONVENTION

208. Article 41 of the Convention provides:

> "If the Court finds that there has been a violation of the Convention or the Protocols thereto, and if the internal law of the High Contracting Party concerned allows only partial reparation to be made, the Court shall, if necessary, afford just satisfaction to the injured party."

### A. Damage

#### 1. The first applicant

209. The first applicant claimed 86,588 euros (EUR) in respect of pecuniary damage. That claim was related to her lost earnings during the period of her deprivation of liberty. She also claimed EUR 100,000 in respect of non-pecuniary damage. She based that claim on the fact that she had been deprived of her liberty for almost four years, first in pre-trial detention and then in prison.

210. The Government submitted that the first applicant's claims were unjustified and had to be rejected in their entirety.

211. The Court does not discern any causal link between the violation of Article 6 § 1 found and the pecuniary damage alleged; it therefore rejects that claim. Similarly, it rejects the claim for non-pecuniary damage since the grounds for that claim had no connection to the violation of Article 6 § 1 found in the present case.

#### 2. The second applicant

212. The second applicant claimed the following amounts in respect of pecuniary damage, which he considered to be a consequence of the violation of his right to a fair trial: (a) 12,340,545 Polish zlotys (PLN) in loss of income from the company Universal; (b) 360,000 US dollars (USD) in loss of salary from BSTC Group Inc., the US company where he had been employed; and (c) PLN 170,649.30, forfeited as compensation for damage to the State Treasury.

213. The second applicant also claimed EUR 50,000 in respect of non-pecuniary damage. He argued that his personal and business reputation had been damaged as a result of the extensive media coverage and long duration of the case. As a consequence of the case, he had been forced to resign as chairman of the board of directors at Millenium Bank and Polsat, a television company. He had also suffered health problems.

214. The Government submitted that the second applicant's claims were unjustified and had to be rejected in their entirety. They underlined that the claim for pecuniary damage was not related to the issues communicated.

215. The Court does not discern any causal link between the violation of Article 6 § 1 found in the present case and the pecuniary damage alleged; it therefore rejects this claim.

216. In respect of the claim for non-pecuniary damage, the Court notes that it has found a violation of Article 6 § 1 in respect of only one of the three complaints made under that provision, namely that concerning the principle of a "tribunal established by law". Having regard to this and the particular circumstances of the present case, the Court considers that the finding of a violation constitutes in itself sufficient just satisfaction for any non-pecuniary damage which may have been sustained by the second applicant.

### 3. Both applicants

217. The Court has recently summarised the general principles relating to Article 46 of the Convention in its judgment in *Moreira Ferreira v. Portugal (no. 2)* ([GC], no. 19867/12, §§ 47-51, ECHR 2017 (extracts), with further references). Those general principles indicate that a finding by the Court of a violation of Article 6 of the Convention does not automatically require a reopening of the domestic criminal proceedings. Nevertheless, this is, in principle, an appropriate, and often the most appropriate, way of putting an end to the violation and affording redress for its effects (ibid., § 52). More specifically, where an individual has been convicted following proceedings that have entailed breaches of the requirements of Article 6 of the Convention, a retrial or reopening of the case, if requested, represents in principle an appropriate way of redressing the violation. However, the specific remedial measures, if any, required of a respondent State in order for it to discharge its obligations under the Convention must depend on the particular circumstances of the individual case and be determined in the light of the Court's judgment in that case, and with due regard to the Court's case-law (ibid., § 50).

218. The Court notes that Article 540 § 3 of the Code of Criminal Procedure provides for the possibility of reopening criminal proceedings when such a need results from a judgment of the Court (see paragraph 105 above). The wording of that provision affords the domestic courts a margin of appreciation in that regard.

219. In the present case, the Court has found a violation of Article 6 § 1 as regards the principle of a "tribunal established by law" in respect of the first-instance court. It has also noted that the appellate courts dismissed the applicants' arguments to the effect that a formal fault in the assignment of a trial court judge had affected the content of the trial court's judgment. Having regard to the nature of its finding and the reasons underlying it (see

CHIM AND PRZYWIECZERSKI v. POLAND JUDGMENT          43

paragraphs 138-142 above), the Court considers that, in the particular circumstances of the present case, it is not for this Court but for the domestic courts to decide whether a reopening of the criminal proceedings is necessary or not to give effect to the present judgment (compare *Henryk Urban and Ryszard Urban v. Poland*, no. 23614/08, §§ 56 and 66, 30 November 2010).

### B. Costs and expenses

220. The first applicant did not submit a claim for costs and expenses.

221. The second applicant claimed PLN 80,000 (approximately EUR 20,000) for the legal costs of his three counsels incurred before the domestic courts. He did not produce any invoices since at the relevant time it was not usual practice for legal fees to be invoiced in Poland, but submitted a statement made before a US notary to substantiate his claim. The second applicant also claimed EUR 17,494.73 for the costs incurred for his representation before the Court by the firm Sjöcrona Van Stigt Attorneys, and supported their claim with relevant documents.

222. The Government submitted that only the costs actually incurred in the preparation and defence of the applicant's case before the Court, and not before the domestic courts, could be taken into consideration. In any event, they asked for the claim for costs and expenses to be rejected.

223. The Court reiterates that only legal costs and expenses found to have been actually and necessarily incurred and which are reasonable as to quantum are recoverable under Article 41 of the Convention (see, among other authorities, *Roche v. the United Kingdom* [GC], no. 32555/96, § 182, ECHR 2005-X). The Court notes that it has found a violation in respect of only one of the three complaints under Article 6 § 1 made by the second applicant. Accordingly, only part of costs and expenses of the second applicant are recoverable.

224. In the present case, regard being had to the documents in its possession and the above criteria, the Court rejects the claim for costs and expenses in the domestic proceedings for lack of appropriate supporting documents. It considers it reasonable to award the second applicant the sum of EUR 5,000 for the proceedings before the Court.

### C. Default interest

225. The Court considers it appropriate that the default interest rate should be based on the marginal lending rate of the European Central Bank, to which should be added three percentage points.

44          CHIM AND PRZYWIECZERSKI v. POLAND JUDGMENT

## FOR THESE REASONS, THE COURT, UNANIMOUSLY,

1. *Decides* to join the applications;

2. *Declares* the complaints concerning the irregular assignment of Judge
   A.K. to the case, alleged lack of impartiality and the second applicant's
   complaint regarding the alleged legislative interference in his case
   admissible and the remainder of the applications inadmissible;

3. *Holds* that there has been a violation of Article 6 § 1 of the Convention
   as regards the principle of a "tribunal established by law";

4. *Holds* that there has been no violation of Article 6 § 1 of the Convention
   on account of the alleged lack of impartiality;

5. *Holds* that there has been no violation of Article 6 § 1 of the Convention
   on account of the alleged legislative interference in the criminal
   proceedings in respect of the second applicant;

6. *Holds* that the finding of a violation constitutes in itself sufficient just
   satisfaction for the non-pecuniary damage sustained by the second
   applicant;

7. *Holds*
   (a) that the respondent State is to pay the second applicant, within three
   months from the date on which the judgment becomes final in
   accordance with Article 44 § 2 of the Convention, EUR 5,000 (five
   thousand euros), plus any tax that may be chargeable, in respect of costs
   and expenses, to be converted into the currency of the respondent State
   at the rate applicable at the date of settlement;

   (b) that from the expiry of the above-mentioned three months until
   settlement simple interest shall be payable on the above amount at a rate
   equal to the marginal lending rate of the European Central Bank during
   the default period plus three percentage points;

8. *Dismisses* the remainder of the applicants' claim for just satisfaction.

Done in English, and notified in writing on 12 April 2018 pursuant to
Rule 77 §§ 2 and 3 of the Rules of Court.

Abel Campos                          Linos-Alexandre Sicilianos
Registrar                            President